ORIGINAL

EVE M. GREEN, ESQ.    5550
24 N. Church Street, Suite 409
Wailuku, Maui, Hawaii 96793
(808) 242-4049  Facsimile (808) 244-4021

DAVID A SERENO, ESQ.    4739
55 N. Church Street, #B
Wailuku, Maui, Hawaii 96793
(808) 242-5710  Facsimile (808) 242-7246

DAVID J. GIERLACH, ESQ.    5041
5 Waterfront Plaza, Suite 330
500 Ala Moana Blvd.
Honolulu, Hawaii 96813
(808) 523-1332  Facsimile (808) 526-2275

Attorneys for Plaintiffs

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 2 1 2005

at _____ o'clock and _____ min. ___M
SUE BEITIA, CLERK

## IN THE UNTIED STATE DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VALERIE GREGORY, Individually and as Special Administrator of the Estate of RICHARD J. GREGORY, Deceased, and as next friend of ISREAL GREGORY, a minor, KEANU GREGORY, a minor, KALANI GREGORY, a minor, and SHAYLISSE GREGORY, a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF MAUI, MAUI POLICE DEPARTMENT, GARRET TIHADA, EDWIN K. AMONG, NICHOLAS ANGELL, JOHN DOE OFFICERS 1-10, JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, and DOE GOVERNMENTAL ENTITIES 1-10,<br><br>Defendants | CIVIL NO. CV 04-00516 SPK KSC<br>(Other Non-motor vehicle tort)<br><br>PLAINTIFFS VALERIE GREGORY, Individually and as Special Administrator of the Estate of RICHARD J. GREGORY, Deceased, and as next friend of ISREAL GREGORY, a minor, KEANU GREGORY, a minor, KALANI GREGORY, a minor, and SHAYLISSE GREGORY, a minor's MEMORANDUM IN OPPOSITION TO DEFENDANTS COUNTY OF MAUI, MAUI POLICE DEPARTMENT, GARRET TIHADA, EDWIN K. AMONG AND NICHOLAS ANGELL'S MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF SERVICE<br><br>Hearing:<br>Date:  January 13, 2006<br>Time:  10:00 a.m.<br>Judge:  Hon. Samuel P. King |

PLAINTIFFS VALERIE GREGORY, Individually and as Special
Administrator of the Estate of RICHARD J. GREGORY, Deceased,
and as next friend of ISREAL GREGORY, a minor, KEANU
GREGORY, a minor, KALANI GREGORY, a minor, and SHAYLISSE
GREGORY, a minor's MEMORANDUM IN OPPOSITION
TO DEFENDANTS COUNTY OF MAUI, MAUI POLICE
DEPARTMENT, GARRET TIHADA, EDWIN K. AMONG AND
NICHOLAS ANGELL'S MOTION FOR SUMMARY JUDGMENT

PLAINTIFFS VALERIE GREGORY, Individually and as Special Administrator

ofthe Estate of RICHARD J. GREGORY, Deceased, and as next friend of ISREAL

GREGORY, a minor, KEANU GREGORY, a minor, KALANI GREGORY, a minor,

and SHAYLISSE GREGORY, a minor (hereinafter "Plaintiffs") herby submit their

MEMORANDUM IN OPPOSITION OF DEFENDANTS COUNTY OF MAUI, MAUI

POLICE DEPARTMENT, GARRET TIHADA, EDWIN K. AMONG AND NICHOLAS

ANGELL'S Motion for Summary Judgment, dated October 14, 2005.

DATED:    Honolulu, Hawaii    12/21/05                .


_____

DAVID J. GIERLACH, ESQ.

One of the Attorneys for Plaintiffs

## TABLE OF CONTENTS

I.    STATEMENT OF FACTS............................................    1

  A.    The Events Leading Up to the
        Police Being Called............................................    1

  B.    The Police Response to Personal
        Assistance Request............................................    2

  C.    The Use of a Choke Hold and Richard
        Gregory's Death...............................................    4

  D.    Police Response to Plaintiff's Claim of
        Inability To Breathe...........................................    5

  E.    The Medical Issues Surrounding
        Richard J. Gregory's Death................................    7

  F.    D.P. Van Blaricom.............................................    8

  G.    Defendants' Motion for Summary Judgment............    10

II.   LEGAL ARGUMENT............................................    11

  A.    QUALFIED IMMUNITY IS INAPPLICABLE TO
        THE FACTS AT BAR ....................................    11

  B.    SUBSTANTIAL FACTS EXIST TO SUPPORT
        PLAINTIFFS' CLAIM THAT THE COUNTY WAS
        NEGLIGENT IN HIRING, TRAINING, AND
        SUPERVISING ITS POLICE OFFICERS............    21

  C.    THE STRUGGLE BETWEEN POLICE
        AND PLAINTIFF WAS A SUBSTANTIAL
        FACTOR IN BRINGING ABOUT THE DEATH
        OF RICHARD J. GREGORY..........................    25

CONCLUSION......................................................    26

## TABLE OF AUTHORITIES

Page

### CASES

*Alexander, et al. vs. Beale Street Blues*
*Company, Inc., et al.*, 108 F. Supp.2d 934
(Western Dist. Tenn. 1999).......................................    16, 17

*Cordeiro v. Burns*, 7 Haw. App. 463,
776 P.2d 411 (1990).......................................    11

*Deorle vs. Rutherford*, 272 F.3d 1272,
1282-83 (9th Cir. 2001).................................    15

*Drummond vs. City of Anaheim*,
343 F.3d 1052, 1056 (9th Circ. 2003)............................    12, 13, 14,
15, 16

*Graham vs. Connor, et al.* 490 U.S. 386, 396,
109 S.Ct. 1986 (1989).......................    14, 17, 18

*Johnson vs. City of Cincinnati*, 39 F. Supp.2d 1013
(Dist. Ct. So. Dist. Ohio, 1999)...............    24

*Leary v. Poole*, 5 Haw. App. 596 (1968).................................    11

*Miller v. Manuel*, 9 Haw. App. 56,
828 P.2d 286 (1991), *cert. denied*,
72 Haw. 618, 841 P.2d 1075 (1992)...................................    11

*Saucier v. Katz*, 533 U.S. 194,
121 S.Ct. 2151 (2001).......................................    12

### PUBLICATIONS

Di Maio & Di Maio, *Excited Delirium Syndrome*
(Taylor & Francis, 1993)...................................    7, 19, 20, 22,
23, 25

### RULES/ STATUTES

*Hawaii Rules of Civil Procedure*, Rule 56(c) ...........................    11

IN THE UNTIED STATE DISTRICT COURT

FOR THE DISTRICT OF HAWAII

VALERIE GREGORY, Individually
and as Special Administrator of
the Estate of RICHARD J. GREGORY,
Deceased, and as next friend of ISREAL
GREGORY, a minor, KEANU GREGORY, a
minor, KALANI GREGORY, a minor, and
SHAYLISSE GREGORY, a minor,

Plaintiffs,

vs.

COUNTY OF MAUI, MAUI POLICE
DEPARTMENT, GARRET TIHADA,
EDWIN K. AMONG, NICHOLAS
ANGELL, JOHN DOE OFFICERS 1-10,
JOHN DOES 1-10, JANE DOES 1-10, DOE
CORPORATIONS 1-10, DOE
PARTNERSHIPS 1-10, and DOE
GOVERNMENTAL ENTITIES 1-10,

Defendants

CIVIL NO. CV 04-00516 SPK KSC
(Other Non-motor vehicle tort)

MEMORANDUM IN OPPOSITION TO
DEFENDANTS COUNTY OF MAUI,
MAUI POLICE DEPARTMENT,
GARRET TIHADA, EDWIN K.
AMONG AND NICHOLAS
ANGELL'S MOTION FOR
SUMMARY JUDGMENT

## MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### I.    STATEMENT OF FACTS

#### A.    The Events Leading Up to the Police Being Called

On December 2, 2002, RICHARD J. GREGORY, aged 51, left his home in

Pukalani and traveled to a music studio in Lahaina, Maui, Hawaii.  See Exhibit

"1"  Mr. Gregory was the husband of VALERIE GREGORY and the father of

ISREAL, KEANU, KALANI and SHAYLISSE GREGORY.  See Exhibit "1"

RICHARD J. GREGORY arrived at the music studio, where he had been invited to go by Ross Fox, an acquaintance. See Exhibit "2 After arriving at the studio, Mr. Gregory asked for and received permission to play a guitar that was in the studio. See, Exhibit 3 Mr. Gregory stated he needed to tune the guitar and was asked by Jason Fuqua not to "screw with it." See, Exhibits "4", "5" Mr. Gregory then handed the guitar back and began tuning his own guitar. See, Exhibits "5", "6" Mr. Fox, thereafter, decided to leave and, when he asked Mr. Gregory to accompany him, Gregory refused. See, Exhibits "4", "7" Mr. Fox then left. See, Exhibits "5", "6"

Jason Fuqua noted that Mr. Gregory then began acting weird. See, Exhibits "5", "8" When asked to leave, Richard Gregory refused. See, Exhibits "4", "7", "9" The police were called. See, Exhibits "8", "10"

**B.      The Police Response to Personal Assistance Request**

Police responded to the call of a trespasser at the music studio, who was freaking out and might be on drugs. See, Exhibits 11, 12 Police responded to a personal assistance complaint because RICHARD would not leave the premises. Exhibits 12, 13 at p. 2, 14 Police knew that RICHARD was acting in a strange and bizarre manner. Exhibits 12, 13

On approach to the unit, police describe seeing a man exit the unit and, after questioning the man, determined that the man was not the one who wouldn't leave. Exhibits "12", "13", "15", "16"

According to Defendant Officers, they heard nothing going on as they approached the studio. Exhibits "13", "14", "16" As they entered, they saw

RICHARD drinking from a jug of water.  Exhibits "12", "14", "16", "17"

RICHARD began walking towards the officers at the door and stated "*Oh, I'm*

*glad to see you*," [emphasis supplied] and that he was a Christian or something

like that.  Exhibits "12", "14", "16", "18"  Officer Tihada describes RICHARD

as holding a jug of water and a yellow pen at the time the officer's approached

and asking "why, why" when officers instructed him to put the pen down.

Exhibits "13", "14"  *He admits that the pen was not being held in a threatening*

*manner*.  Exhibit 13  According to Officer Among, RICHARD  was asked quite a

few times to put down the pen.  Exhibit "19"

RICHARD then began ranting and officers grabbed RICHARD'S arm and

began struggling with him to take the pen.  Exhibits "12", "14", "16"  After

police began struggling with RICHARD, RICHARD responded "what are you

doing? I'm a Christian."  Exhibits "14", "20"  Officer Tihada described

grabbing RICHARD and taking the pen from his hand.  Exhibit "13"  A struggle

then ensued when officers tried to handcuff RICHARD.  Exhibits "12", "13",

"14", "16"  Officer Angell admitted that RICHARD never tried "to punch or kick

me personally" and, to Officer Angell's knowledge, did not attempt to do so to

the other officers.  Exhibit "14"  RICHARD made no threats or derogatory

comments to the officers.  Exhibits "13", "14", "21", "22"

Vinnie Finazzo, one of the renter's of the studio, *was in the studio when*

*police arrived*.  Exhibit "23"  According to Finazzo, RICHARD moved behind

the drum set as police arrived.  Exhibit "24"  Finazzo denies that RICHARD had

anything in his hands as police arrived.  Exhibit 25  As he left the studio to talk

3

to police, RICHARD moved to the right corner of the room and that as police
entered, he and Jackson waited outside. Exhibit 26 When the police entered
RICK started screaming "What are you doing, I'm a good Christian, I'm a family
man" about eight times, then he started yelling "police brutality", as the police
officers were all telling Rick "calm down, just relax and put your hands behind
your back." Exhibit "20" According to Finazzo, a scuffle occurred immediately
after police entered the studio. Exhibit "27", "28" He was amazed that the
incident had turned into a "wrestling match." Exhibit "29" He estimates the
scuffle lasted for five to seven minutes. Exhibit "30"

The only thing Finazzo heard the police say upon their entry into the
studio was for RICHARD to "calm down, calm down." Exhibit "31" Jason
Fuqua, who was also present outside the studio when police entered, specifically
denies hearing any police officer say that GREGORY had something in his hand.
Exhibit "32" Fuqua estimates the struggle lasted for ten minutes. Exhibit "33"

### C.    The Use of a Choke Hold and Richard Gregory's Death

During the "struggle", Officer Tihada used some type of choke hold on

RICHARD. Exhibit "13", "34" Officer Angell stated as follows:

Q:    Okay Nick, you know during the struggle, did anybody use um,
force, like, you know, the carotid choke hold or hitting the, hitting him with a
fist or any kind of
A:    No hitting. Uh, Officer Tihada had him, I don't know if it
specifically was a carotid hold, but he had him around, around his neck. He had
him initially I think around his shoulders, but when we went to the ground, I
think it went up.

Exhibit "14"

Officer Among describes Tihada as being on top with his arm around

4

RICHARD's neck. Exhibits "16", "34"    He describes them as falling over the

sofa, with Tihada's arm still around RICHARD'S neck in sort of a carotid hold

"but it wasn't" and then ending up on the floor. Exhibit "16"

Officer Tihada pushed RICHARD'S face into the couch by pressing on the

back of his neck. Exhibit "13" He got his arm around RICHARD's neck and

placed his armpit on the back of RICHARD's neck, locking his arm down

towards RICHARD's chest. Exhibit "13"    Officer Tihada *then held*

*RICHARD'S face into the couch by pressing on his neck*. Exhibit "13"

### D.    Police Response to Plaintiff's Claim of Inability To Breathe

While Tihada had his arm around RICHARD'S neck and was pressing

RICHARD'S face into the couch, RICHARD complained numerous times of

being unable to breathe. Exhibit "13", "14" Officer Angell stated:

> Q:    Was the guy complaining about, you know, not being able to
> breathe, anything (unintelligible – both speaking)
> A:    He was saying to us, he was talking to us, saying I can't breathe.
> Q:    And that was
> A:    The whole time.
> Q:    What about when Officer Tihada had the hold on his neck?
> A:    He was also talking to us, saying the same thing.
> Q:    Okay. So was he saying that before the hold and after the hold or
> during the hold?
> A:    During the hold, the whole time. During the hold, not, obviously
> not before Garret got around him, but during the whole time we had him down
> there, and Officer Tihada had him around, had the carotid on him, he was talking
> to us, telling us, telling him, "I'm a Christian. I can't breathe. Just leave me
> alone" or something like that.

Exhibit "14" He also testified that after the choke hold was released:

> At that point, he wasn't saying anything. He was still lying on his
> stomach at that point, once we he got into his cuffs. And then when we
> pulled him over, that's when we noticed the way he looked. So he, at, at
> the point that I got him cuffed, behind his back, and I want to point out
> that it wasn't his arms didn't go limp or anything. I cuffed him easily. I

still had to struggle to cuff him, the whole time. Once I had him cuffed,
Garret, "I got him cuffed. I got him cuffed." Everybody releases. We all,
we all kind of just stepped back for a second, you know, wow! Roll him
over, get him up and then we realized he's, he's not looking well.

Exhibit "14"

Jason Fuqua, a witness, who was in the studio prior to the arrival of
police, reported hearing Richard say "I can't breathe, I can't breathe" to which
officers responded "If you can talk you can breathe." Exhibits "35", "36"

Officer Tihada, when questioned whether RICHARD ever complained that
he couldn't breathe, stated "He said, yeah, he said, "I cannot breathe, I cannot
breathe," I was like, "No, you can breathe because you're talking to me. If you
couldn't breathe, you cannot talk," and was good 'cause the whole time he kept
talking and talking and talking." Exhibit "13" Tihada admits that he was on top
of RICHARD at this time and that RICHARD complained of being unable to
breathe at least ten times. Exhibit "13" Tihada admitted that RICHARD, despite
struggling, was not trying to injure the officers. Exhibit "13" Tihada describes
RICHARD as standing up and flipping over and landing on the ground. Exhibit
"13" He describes continuing his hold on RICHARD's neck as this takes place,
pressing his forearm into RICHARD's throat. Exhibit "13" Finally, Officer
Tihada describes placing the cuffs on Richard, turning him over and noticing that
RICHARD's face looked odd. Exhibit "13" He describes RICHARD's face as
looking purplish and discolored. Exhibit "13" He describes RICHARD as
having stopped moving once the handcuffs were placed. Exhibit "13" Officer
Tihada admits using a hold on RICHARD, but denies that it was a carotid hold.
Exhibit "13"

6

After officers noted RICHARD was unresponsive, they attempted CPR.
Exhibit "16", "37" One officer ran to get a defibrillator. Exhibit "16", "37"
Despite resuscitation attempts, RICHARD GREGORY died. Exhibit "38"

After RICHARD died, Finazzo viewed the studio where the "struggle"
occurred. Exhibit "39" He estimated that the free space in the studio was
approximately 5 x 5. Exhibit "40" Finazzo was surprised that, despite the noise
and scuffling he heard, nothing was knocked over and everything was where it
had been. Exhibit "39" Even the music cases piled on the couch where police
allegedly struggled with RICHARD remained as they had been prior to the
struggle. Exhibit "41"

### E.    The Medical Issues Surrounding Richard J. Gregory's Death

An autopsy was performed on RICHARD by Dr. Anthony Manoukian.
Exhibit "38" Dr. Manoukian described the physiological cause of death as
cardiopulmonary arrest. Exhibit "38", "42 According to Dr. Manoukian,
RICHARD'S complaint of inability to breathe was likely shortness of breathe, a
common symptom of a heart attack. Exhibits "43", "44" Dr. Manoukian noted:

> Sudden death during or immediately after a violent struggle is well-
> described in the forensic literature. Often, theses events are unassociated
> with a fully explanatory anatomic cause of death. In the typical scenario,
> the deceased has engaged in a violent struggle with one or more
> individuals. Restraint or positional considerations may be contributory.
> During the struggle, or more commonly immediately after it, the
> individual abruptly becomes unresponsive, develops cardiopulmonary
> arrest, and does not respond to resuscitation. DiMaio & DiMaio (1993)
> hypothesized that death is due to Norepinephrine and Epinephrine surges
> in association with ischemia or the myocardium sensitizing the heart to
> terminal arrhythmia. This phenomenon has been described in association
> with psychological as well as physical stress and may be in association
> with or without underlying heart disease.

7

Exhibit "38"

*According to Dr. Manoukian, if the struggle had not occurred,*
*RICHARD GREGORY would not have died.* Exhibit 44  To a reasonable degree
of medical probability, the struggle was a substantial factor in causing the death
of Richard Gregory.  Exhibit "45"

### F.    D.P. Van Blaricom

Plaintiffs retained D.P. Van Blaricom, retired Chief of Police in Bellevue,
Washington and police officer for over forty-eight years, to review the actions
taken by police.  Exhibit " 46"  Mr. Van Blaricom is a recognized expert in
matters relating to police administration, policies, practices, procedures and
standards of care; restraint asphyxia; internal investigation and discipline.
Exhibit "46"

According to D.P. Van Blaricom, RICHARD displayed the classic
symptoms of excited delirium.  Exhibit "46"  Had defendant officers been
properly trained, they would have recognized this and have known that
RICHARD was at risk of restraint asphyxia.  Exhibit "46"  Law enforcement
chief policy makers in the United States have long been well aware of the risks
of restraint asphyxia through adequate training.  Exhibit "46"  Had officers been
properly trained and aware of current literature, officers would have identified
the risk of restraint asphxia. Exhibit "46"

RICHARD displayed symptoms of excited delirium in that he appeared
extremely high strung, excitable and jumpy, rigid and tense, with eyes that were
saucer-like and spoke loudly and rapidly.  Exhibit "46"  If the officers were

8

adequately trained, they would have known that persons displaying the symptoms of excited delirium are at increased risk of restraint asphyxia. *Id.* If defendant officers had been properly trained, they should have approached RICHARD demonstrating a calming and helpful manner so as to prevent escalating the encounter. Exhibit "46"

Instead, despite knowing that someone had just exited the unit without problem, police came in aggressively, initiated a physical engagement that guaranteed a struggle and failed to attempt to diffuse the situation. Exhibit "46" RICHARD did not pose a significant threat of death or serious physical injury. Exhibit "46" Even if a pen was present, it was immediately removed from RICHARD'S hand as noted by Officer Tihada. Exhibit "46"

Despite the displayed symptoms of excited delirium and the lack of significant threat from RICHARD, the officers forced RICHARD's face into the couch and applied the carotid and bar arm choke holds, both being potentially lethal force. Id. Not only did Officer Tihada apply a choke hold, he applied it "as hard as [he] could" with his "weight holding him down" despite RICHARD's claims that he could not breathe and was choking and until RICHARD died. *Id.*

Despite the fact that RICHARD complained of inability to breathe, officers continued to use excessive force to restrain him. Exhibit "46" "It is well understood, by adequately trained law enforcement officers, that a person who cannot breathe will increasingly struggle to maintain that essential function for sustaining life. Exhibit "46" "It is objectively unreasonable excessive force per se to actively interfere with respiration until breathing ceases. Exhibit "46"

9

## G.    Defendants' Motion for Summary Judgment

Defendants now bring a motion for summary judgment alleging that police

are protected by qualified immunity; the officers were adequately trained; the

Officers were not negligent and therefore the County of Maui was not negligent;

and that RICHARD J. GREGORY died of natural causes. Plaintiffs request that

this Court deny Defendants' motion for summary judgment because

1) There are sufficient facts from which a jury may conclude that the police were overly aggressive in their approach to Richard J. Gregory, thereby violating his Constitutional Rights;

2) There are sufficient facts from which a jury may conclude that police officers used excessive force in restraining Richard J. Gregory, thereby violating his Constitutional Rights;

3) There are sufficient facts from which a jury may conclude that any reasonable officer would have understood the alleged conduct to constitute such a violation;

4) There are sufficient facts from which a jury may conclude that the officers were improperly trained to respond to a suspect displaying symptoms of excited delirium and/or mental illness;

5) There are sufficient facts from which a jury may conclude that the officers were negligent in their response to Richard J. Gregory's claims that he could not breathe;

6) There are sufficient facts from which a jury may conclude that the officers were improperly trained to respond to a mentally ill and/or suspect exhibiting symptoms of excited delirium and who complained of inability to breathe;

7) There are sufficient facts from which the jury may conclude that defendants were following an improper policy, rule, procedure, custom, etc. with regard to their belief that if a suspect could talk, they could breathe;

8) There are sufficient facts from which a jury may conclude that absent the described struggle, Richard J. Gregory would not have suffered cardiopulmonary arrest and death.

10

## II.    LEGAL ARGUMENT

A heavy burden is placed upon the party seeking summary judgment. It is incumbent upon the moving party to demonstrate to the Court, not only an absence of material questions of fact, but also entitlement to judgment as a matter of law. *Hawaii Rules of Civil Procedure*, Rule 56(c)  In considering a motion for summary judgment, the Court is to construe any and all reasonable inferences that may be drawn from the facts in a light most favorable to the party opposing the motion. *Leary v. Poole*, 5 Haw. App. 596 (1968).

Issues of negligence and proximate cause, as those clearly presented before the Court, are ordinarily not susceptible to summary adjudication. *Cordeiro v. Burns*, 7 Haw. App. 463, 776 P.2d 411 (1990)  These issues are only subject to summary adjudication where the facts are undisputed or are susceptible of only one reasonable interpretation. *Id.* Absent undisputed facts and/or susceptibility of only one reasonable interpretation, the trial court is under a duty to pass upon the question of negligence or proximate cause as a matter of law. *Id.*

Although courts generally scrutinize the materials submitted by the moving party on a summary judgment motion to ensure compliance with the requirements of this rule, they are more indulgent toward materials submitted by a non-moving party; this is because of the drastic nature of summary judgment proceedings, which should not become a substitute for existing methods of determining factual issues. *Miller v. Manuel*, 9 Haw. App. 56, 828 P.2d 286 (1991), *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1992)

### A.    QUALFIED IMMUNITY IS INAPPLICABLE TO THE FACTS AT BAR

11

Defendants' claim summary judgment should be granted because they

are protected from liability under the doctrine of qualified immunity. The

individual defendant officers, however, are not entitled to qualified immunity

under the facts of this case.

In evaluating whether defendants are entitled to qualified immunity, the

Court must

> (1) determine whether, taken in the light most favorable to the
> party asserting the injury . . . the facts alleged show [that] the
> officer's conduct violated a constitutional right.
>
> (2) If so, determine whether the right was clearly established . . . in
> light of the specific context of the case such that "it would be
> clear to a reasonable officer that his conduct was unlawful in
> the situation he confronted.

*Drummond vs. City of Anaheim*, 343 F.3d 1052, 1056 (9th Circ. 2003), *citing*

*Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001) In determining whether

the officers' conduct violated a constitutional right, the analysis of a Fourth

Amendment claim of excessive force requires "balancing the nature and quality

of the intrusion on a person's liberty with the countervailing governmental

interests at stake to determine whether the use of force was objectively

reasonable under the circumstances. *Id.* Such analysis "requires careful

attention to the facts and circumstances of each particular case and a careful

balancing of an individual's liberty with the government's interest in the

application of force." *Id.* The Drummond Court cautioned, however, "[b]ecause

such balancing nearly always requires a jury to sift through disputed factual

contentions, and to draw inferences therefrom, we have held on many occasions

12

that *summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly.  Id.* [emphasis supplied.]

In *Drummund*, the police were called to assist transporting a mentally ill man to the hospital.  *Ibid.* at p. 1054  The caller was concerned that the man was a danger to himself.  *Id.*  When officers responded, they determined that Drummond was unarmed, hallucinating and in an agitated state. *Id.*  An ambulance was called but, before the ambulance arrived, police officers decided to take Drummond into custody.  *Id.*  Officers knocked Drummond to the ground and cuffed his arms behind his back.  *Id.*  Although Drummond was not resisting arrest, one officer placed his knee on Drummond's back and the weight of his body on Drummond.  Drummond repeatedly told officers he could not breathe and that they were choking him.  *Id.*  Officers continued to put their weight on Drummond's neck and back and, after he was "hobble restrained" Drummond went limp and lost consciousness.  *Ibid.* at p. 1055  CPR was initiated and, although initially successful, Drummond sustained severe brain damage and fell into a coma. *Id.*

The trial court granted defendant officers' motion for summary judgment on the issue of qualified immunity.  The Ninth Circuit Court of Appeals reversed the trial court's grant of summary judgment holding that "under the circumstances, it would have been clear to a reasonable officer at the time of the encounter that the force alleged was constitutionally excessive." *Ibid.* at p. 1054  In making this determination, the Court held that the "force allegedly employed was severe and, under the circumstances, capable of causing

13

death or serous injury." *Ibid*. at p. 1056  The Court stated that "under similar circumstances, in what has come to be known as "compression asphyxia" prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Id*.

The Court held that the reasonableness of the force used must be weighed against the need for the force. *Ibid*. at p. 1057  In so weighing, "the government interest in safely effecting an arrest must be examined in light of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.  See also, *Graham vs. Connor, et al*. 490 U.S. 386, 396, 109 S.Ct. 1986 (1989)  The Court found that under the facts of the case before it, there was no underlying crime and that, although Drummond may have represented a threat to himself or others before he was handcuffed, a jury could find that he posed only a minimal threat to anyone's safety. *Id*.  Once he was handcuffed on the ground and not resisting, there was little or no need to use any further physical force. *Ibid* at p. 1058

The Court further held that "a detainee's mental illness must be reflected in any assessment of the government's interest in the use of force:

> The problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense. In the former instance, increasing the use of force may, in some circumstances at least, exacerbate the situation; in the latter, a heightened use of less-than-lethal force will usually be helpful in bringing a dangerous situation to a swift end. In the case of mentally unbalanced persons, the use of officers and others trained

14

> in the art of counseling is ordinarily advisable, where feasible, and
> may provide the best means of ending a crisis . . . Even when an
> emotionally disturbed individual is "acting out" and inviting
> officers to use deadly force to subdue him, the governmental
> interest in using such force is diminished by the fact that the
> officers are confronted, not with a person who has committed a
> serious crime against others, but with a mentally ill individual. We
> do not adopt a per se rule establishing two different classifications
> of suspects: mentally disabled persons and serious criminals.
> Instead, we emphasize that where it is or should be apparent to the
> officers that the individual involved is emotionally disturbed, that
> is a factor that must be considered in determining, under *Graham*,
> the reasonableness of the force employed."

*Ibid.* at p. 1058, *citing Deorle vs. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir.
2001)

The Drummond Court determined that, under the facts of the case,
the force employed was greater than was reasonable under the circumstances.
The Court acknowledged that some force was justified in restraining Drummond
so he did not injure himself, but that the amount of force used "was clearly
constitutionally excessive when compared to the minimal amount that was
warranted." *Ibid.* at p. 1059 "The officers – indeed, any reasonable man –
should have known that squeezing the breath from a compliant, prone, and
handcuffed individual despite his please for air involves force that is greater than
reasonable." *Id.* The Court also noted that the officers had been specifically
warned of the extreme danger of this sort of force, not only through publicity in
the area of similar type cases, but through a previously issued training bulletin
"specifically warning officers that " when one or more [officers] are kneeling on
a subject's back or neck to restrain him, compression asphyxia can result [t]hat
may be a precipitating factor in causing death." *Id.*

15

The existence of prior case law regarding compression asphyxia, publicity and training from their own police department were all factors used by the Court to determine that, under the factual situation presented, the law was clearly established such that a reasonable officer would have known that the conduct was unlawful. As such, the Appellate Court reversed the trial court's grant of summary judgment. *Ibid.* at pp. 1060-1061 The Court held "*We need no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of the two officers' bodies on him even after he complained that he was choking and in need of air violates clearly established law, and that reasonable officers would have been aware that such was the case.*" *Id.* [Emphasis supplied.]

In *Alexander, et al. vs. Beale Street Blues Company, Inc., et al.*, 108 F. Supp.2d 934 (Western Dist. Tenn. 1999), the United States District Court for the Western District of Tennessee similarly denied defendants' motions for summary judgment on Fourth Amendment excessive use of force claim finding that an allegation that officers' positioning of plaintiff during an arrest and their denial of medical care violated plaintiff's right to be free from unreasonable, unjustified and excessive force. Plaintiffs did not allege that defendant officers physical abused plaintiffs' decedent. Plaintiffs alleged officers' physical positioning of plaintiff placed him in grave danger of death by positional asphyxia, which constituted excessive force. *Ibid.* at p. 943 The Alexander court, recognized that "[t]aking all the allegations in the Amended Complaint as true, the court cannot find as a matter of law that plaintiffs could prove no set of

facts in support of their allegations which would paint officers' conduct as being objectively unreasonable." *Id.*

Further, the Court rejected officers' claims of qualified immunity, finding that 1) plaintiff had a Constitutional right to be free from excessive force during a police seizure; 2) "while there may be no particularized right against being handcuffed while unconscious and being placed in a contorted position in the street, there is a particularized right to be free from deadly force, and that right is clearly established; 3) if a reasonable Memphis police officer would know that defendants' positioning of Alexander carried with it a substantial risk of causing death or serious bodily injury, defendants' conduct would have violated a clearly established constitutional right; 4) since the Court could not find that as a matter of law that plaintiffs could prove no set of facts in support of their allegations which would paint officers' conduct as being objectively unreasonable, the officers' were not entitled to qualified immunity. *Ibid.* at pp. 944-945

There is no legal requirement, as alleged by defendants' in footnote 1 (p. 14) of their Memorandum in Support of the Motion for Summary Judgment, that plaintiffs' "prove by clear and convincing evidence that the Officers' conduct was motivated by malice". In *Graham vs. Connor, et al.* 490 U.S. 386, 109 S.Ct. 1986 (1989), the U.S. Supreme Court specifically rejected the substantive due process standard in evaluating Fourth Amendment cases, holding "The proper Fourth Amendment inquiry was one of objective reasonableness

17

under the circumstances, and subjective concepts like malice and sadism had no proper place in that inquiry." *Id*. at p. 397

The case at bar is factually similar to *Drummond*. By all reports, Richard Gregory was acting in a bizarre manner prior to the arrival of the police. Police knew, on their arrival, that Richard Gregory was either mentally ill or on drugs. Police knew that he was wanted for no crime other than refusal to leave the studio. Police observed one of the witnesses safely leave the studio on their arrival. Despite this knowledge, officers immediately resorted to physical restraint and took Richard down upon their entry into the studio.

It is a question of fact for the jury as to whether they believe the police officers' claim that Richard posed a threat of harm to officers because he had a pen in his hand at the time officers entered the studio. No witness heard officers' instructing Richard to put down a pen. See, Exhibits 31, 32 Even if a pen was present, Officer Tihada admitted that the pen was immediately removed from Gregory's hand and tossed away. See, Exhibit 13 All officers' admit that Richard did not verbally threaten them and/or attempt to injure them in any way during the "struggle." See, Exhibits 13, 14, 21, 22 Based upon these facts, a jury may determine that it was excessive use of force to initially confront and attempt to restrain Richard by pressing down on his neck/back as hard as Officer Tihada could until Richard lost consciousness.

Defendants themselves, recognize that Richard died as result of "excited delirium syndrome" (Memorandum in Support of Motion at p. 11) and likely had mental health issues. *Id*. at p. 9 Defendants' actions taken in this

18

matter are directly opposed to the actions they should have taken per their own expert. Defendants' expert, Vincent J.M. Di Maio, has published a book on excited delirium. Exhibit 47, Di Maio & Di Maio, *Excited Delirium Syndrome* (Taylor & Francis, 1993)   According to Di Maio, "Behavioral and cognitive indicators for death due to excited delirium syndrome are as follows:

- Extreme agitation and restlessness
- Incoherent and rambling speech
- Hallucinations
- Delusions with paranoid features
- Disorganized thought content
- Bizarre behavior
- Combativeness
- Violence

*Ibid.* at Ch. 9, "*Prevention of Excited Delirium Syndrome:  The Police and First Responders,* p. 103

"In excited delirium syndrome, there is a synergetic relationship between the physiological effects of the excited delirium, drugs, mental disease and struggling, with resultant sudden death.  Once the "struggle" begins, the cascade of physiological response precipitated by these factors results in the death. *Therefore, de-escalation of the excited delirium, prevention of the struggle,* or rapid termination of the physiological effects of the struggle are the best ways to prevent excited delirium syndrome."  *Ibid.* at p. 97   "The responders can initiate measures aimed at preventing escalation of agitation and

violence. *Physical intervention should only be a last resort and responders must be prepared for the potential for death to occur.*" *Ibid.* at p. 102 [Emphasis supplied.]

"Instead of operating in a safe environment, the police must attempt to create one. If two officers are present, one should be attending to environmental control while the other officer is speaking to the individual. It is important that only one officer directly makes contact verbally with the individual as well as providing a safe physical distance." *Ibid.* at p. 103 "An individual in acute psychosis is not experiencing reality; therefore, responders should make simple demands stated in a non-challenging manner. Listen patiently for individual response and note the level of acceptance and behavior change. At all times, communicate the willingness to help this individual regain control by statements such as "You seem upset," "We can help," "I'm here to help you," "You are safe." Complement the individual's ability to maintain control and follow instructions. Offer positive feedback as the individual begins to respond in a positive manner. . . ." *Id.* "Individuals who are psychotic are distrustful. Any form of crowding by attempting to surround them by officers will only escalate their already distrustful, agitated state. Make slow movements, give simple commands; wait and note the individual's behavioral response. Do they cooperate? Is their level of agitation increasing? . . . *If a struggle with a violent individual can be avoided,* death from excited delirium syndrome is avoided." *Ibid.* at p. 104    [Emphasis in the original]

None of the recommended actions were taken by defendant officers. They immediately resorted to physical restraint, thereby escalating the situation. It is a question of fact for the jury as to whether they believe officers' claims that Richard was resisting arrest. All witnesses agreed that the studio was essentially in the same condition it was prior to any "struggle." Despite close quarters and piled equipment on the couch, nothing in the studio was disturbed by the five to seven minute "violent struggle" that allegedly occurred. As pointed out by plaintiffs' experts, any resisting Richard might have done could have been caused by his inability to get sufficient air.

Based on the factual issues presented, there is sufficient evidence for the jury to determine that officers' violated Richard's constitutional right to be free from excessive use of force. So too is there sufficient evidence and existing law for the jury to determine that it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. As such, plaintiffs' respectfully request that defendants' motion for summary judgment on the issue of qualified immunity be denied.

### B.    SUBSTANTIAL FACTS EXIST TO SUPPORT PLAINTIFFS' CLAIM THAT THE COUNTY WAS NEGLIGENT IN HIRING, TRAINING, AND SUPERVISING ITS POLICE OFFICERS

Under the theory of respondeat superior, the County of Maui may be held liable for the negligent acts of its employees, namely, defendant officers. Defendant County of Maui alleges that, since the officers weren't negligent, it cannot be held negligent. Defendant County of Maui further alleges "There is **no** evidence that the Officers ever acted improperly."

Based on RICHARD's symptoms and the facts and circumstances surrounding the call to the subject officers, the jury may determine that the actions of defendants were negligent and/or excessive. The jury may also determined that the officers either were not trained to recognize situations in which a person may be at increased risk of restrain asphyxia, excited delirium and/or ignored the training they received.

Defendants' own expert recognizes that "Their [police] actions, which are derived from police protocol and training, are deficient in mental and behavioral health practices and techniques for the handling of psychotic individuals, whether the psychosis is due to mental disease or abuse of drugs. Their lack of knowledge, and unintentionally inappropriate practices in attempting arrest, may trigger a fatal situation." Di Maio, p. 100  He further opines "The lack of training in mental health issues related to violent offenders, who may or may not have mental illness, is a serious deficiency in the training of police officers who often face such individuals daily in communities. Law enforcement training protocols should incorporate adequate psychiatric mental heath training techniques in managing individuals who either have mental illness or may be displaying symptoms of such due to drugs." *Id*.

According to Di Maio, "material addressing the management and prevention of violent behavior and the potential for death of individuals in excited delirium must be incorporated into educational programs aimed at police, EMS personnel, and emergency room staff. . . ." *Ibid*. at p. 102 "To prevent deaths from excited delirium syndrome, the police must:

22

- Identify individuals in excited delirium

- *Attempt to de-escalate the situation* and calm them down

- Use overwhelming force if restraint must be used

- After individuals are restrained, monitor them at the scene and during transport

- Immediately transport them to a hospital for treatment and/or observation

*Id.* [Emphasis supplied.] See also, *Ibid.* at pp. 107-110 for recommendations of actions which should be taken by police in confronting an individual who exhibits signs of excited delirium, even one who has a weapon.

None of these actions were taken by defendant officers in their confrontation with Richard Gregory, despite the fact that they knew, or should have known how to recognize excited delirium and its attendant risks and how to appropriately respond. As set forth above, at the time of Richard's arrest, there was substantial publicity on the effects of compression asphyxia, numerous police departments had alerted their officers' to the risk of compression asphyxia, particularly with mentally ill and/or agitated suspects, and there were several Ninth Circuit decisions involving the similar situations.

Based on the existing information and decisions available, the jury could determine that based on the actions taken by defendant officers, the Maui Police Department failed to properly instruct, train, and/or supervise its officers on the risks of compression asphyxia and on the proper application and/or use of potentially lethal holds on agitated and/or mentally ill suspects.

23

*See also, Johnson vs. City of Cincinnati*, 39 F. Supp.2d 1013

(Dist. Ct. So. Dist. Ohio, 1999) ("Conflicting expert testimony raised questions of fact as to whether the action of the individually named defendants in placing decedent in a prone position contributed to his death. Additionally, plaintiff provided evidence from which a reasonable jury could infer that dealing with highly agitated persons was a recurring situation for law enforcement officials and that a violation of civil rights was a predictable result of being inadequately trained to handle such persons.") When faced with a claim of inadequate training, the Johnson Court held "In a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situations will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision to not train the officer reflected "deliberate indifference" to the obvious consequence of the policymaker's choice- namely, a violation of a specific constitutional or statutory right. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Id.* at p. 1019

In the case at bar, there are sufficient facts from which a jury may determine that the defendant County failed to properly train officers to recognize and appropriately react to situations in which excited delirium syndrome and

24

resulting death may result. Defendants' motion for summary judgment should therefore be denied.

## C.   THE STRUGGLE BETWEEN POLICE AND PLAINTIFF WAS A SUBSTANTIAL FACTOR IN BRINGING ABOUT THE DEATH OF RICHARD J. GREGORY

Dr. Manoukian describes the physiological cause of death as cardiopulmonary arrest. Dr. Manoukian opines that the complaint of inability to breathe was likely shortness of breathe, a common symptom of a heart attack. *According to Dr. Manoukian, if the struggle had not occurred, RICHARD GREGORY would not have died.* Exhibit 44  To a reasonable degree of medical probability, the struggle was a substantial factor in causing the death of Richard Gregory. Exhibit "45"

Further, according to defendants' own expert, Vincent Di Maio, "Following a struggle and use of restrain, cardiopulmonary arrest due to excited delirium syndrome may occur at the scene, during transport to jail in a police vehicle, during transport to a hospital by either a police vehicle or EMS, on arrival at a jail or on arrival at the hospital. Typically, these individuals are males between the ages of 16 and 44 years. Most cardiac arrests seem to occur following use of restraint, after the individual stops fighting against the restraint." Di Maio & Di Maio, *supra*. at p. 101  Further, he, like Dr. Manoukian, opines "*If a struggle with a violent individual can be avoided*, death from excited delirium syndrome is avoided." *Ibid*. at p. 104  [Emphasis in the original]

If the jury determines police used excessive force and/or failed to adequately respond to the situation, escalating, rather than defusing the situation, failed to reasonably recognize that Richard was suffering from excited delirium and respond appropriately, causation is established. For these reasons, plaintiffs respectfully request that defendants' motion for summary judgment on the issue of causation be denied.

## CONCLUSION

There clearly are issued of material fact as to what occurred on the evening of December 2, 2002, including the initial approach by officers, the use of a hold on RICHARD, the response to RICHARD's agitation and complaints of an inability to breathe. Based on the arguments set forth above, plaintiffs' respectfully request this Court deny defendant COUNTY OF MAUI and MAUI POLICE DEPARTMENT'S Motion for Summary Judgment.

DATED:     Honolulu, Hawaii ___12/21/05___.

_____
DAVID J. GIERLACH, ESQ.

One of the Attorneys for Plaintiffs

IN THE UNTIED STATE DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| VALERIE GREGORY, Individually and as Special Administrator of the Estate of RICHARD J. GREGORY, Deceased, and as next friend of ISREAL GREGORY, a minor, KEANU GREGORY, a minor, KALANI GREGORY, a minor, and SHAYLISSE GREGORY, a minor,<br><br>           Plaintiffs,<br><br>vs.<br><br>COUNTY OF MAUI, MAUI POLICE DEPARTMENT, GARRET TIHADA, EDWIN K. AMONG, NICHOLAS ANGELL, JOHN DOE OFFICERS 1-10, JOHN DOES 1-10, JANE DOES 1-10, DOE CORPORATIONS 1-10, DOE PARTNERSHIPS 1-10, and DOE GOVERNMENTAL ENTITIES 1-10,<br><br>           Defendants | CIVIL NO. CV 04-00516 SPK KSC<br>  (Other Non-motor vehicle tort)<br><br>CERTIFICATE OF SERVICE |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was

duly served on _____12/21/05_____, upon the following party, by depositing

same in the U.S. Mail, postage prepaid, at her last known address:


     LAUREEN MARTIN, ESQ.
     Deputy Corporation Counsel
     County of Maui
     200 S. High Street
     Wailuku, Maui, Hawaii  96793

Attorney for Defendants.

DATED:     Honolulu, Hawaii _____ 12/21/05 _____.

_____
DAVID J. GIERLACH, ESQ.

One of the Attorneys for Plaintiffs

28