# EXCITED DELIRIUM SYNDROME

## Cause of Death and Prevention

Theresa G. Di Maio
Vincent J.M. Di Maio

CRC
Taylor & Francis
Taylor & Francis Group

EXHIBIT 47

# 9

# PREVENTION OF EXCITED DELIRIUM SYNDROME: THE POLICE AND FIRST RESPONDERS

"The seeds of the future are sown in the present and the directions of their growth and development derive from the past."

— **Lisa Robinson, RN, Ph.D., C.S., F.A.A.N.**

## INTRODUCTION

It is not possible to predict when an episode of excited delirium will result in death.

What we do know is that such deaths occur in association with a violent struggle. The struggle is usually initiated when medical or law enforcement personnel attempt to restrain an individual in order to prevent the individual from harming himself or herself or others after all therapeutic measures to defuse the aggressive and violent behavior have failed. Death typically occurs minutes after the *struggle ceases*.

In excited delirium syndrome, there is a synergetic relationship between the physiological effects of the excited delirium, drugs, mental disease, and struggling, with resultant sudden death. Once the "struggle" begins, the cascade of physiological responses precipitated by these factors results in the death. Therefore, de-escalation of the excited delirium, prevention of the struggle, or rapid termination of the physiological effects of the struggle are the best ways to prevent excited delirium syndrome.

Widespread public outcry over the sudden death of individuals in police custody has in some cases produced panicky unscientific suggestions to prevent such deaths or a hunt for scapegoats to blame for the deaths. In some areas of the country, police officers have been accused of killing the individuals by use of inappropriate restraint measures even if there was no evidence that they even employed such procedures. Publications proposing positional asphyxia as the cause of death continue, even though research has discredited the basis for this theory.[1-4] Because of this, techniques to prevent death due to excited delirium syndrome have focused on preventing non-existent restraint/positional asphyxia.

Deaths due to excited delirium syndrome will continue to occur if nothing is changed in the handling and care of individuals experiencing excited delirium. Therefore, the aim of this chapter is to propose practices and procedures that can be used by law enforcement, emergency medical service (EMS), and emergency room personnel to prevent deaths from excited delirium syndrome.

The various theories and methods presented in this chapter have been extracted from the mental health literature in regard to nursing and hospital emergency care as well as from case reports of sudden deaths occurring in the community, emergency room, or psychiatric and medical facilities.

## THE PROBLEM

Law enforcement and EMS responders encounter two groups of individuals with excited delirium who may die suddenly from excited delirium syndrome. The first are those individuals whose psychotic behavior is drug or alcohol induced. These are the most commonly encountered and the most likely to die. The second group is composed of the mentally ill who are experiencing a relapse of the psychotic features that are inherent to their mental illness or who may have relapsed due to use of illicit drugs or alcohol. The presenting symptoms of both groups are essentially identical. Police tend to encounter individuals with drug-induced excited delirium more than those suffering from mental illness. Mental illness combined with illicit drug use probably presents the greatest risk for a violent encounter by police or EMS personnel, as patients with mental disorders who use drugs have the highest probability of violent behavior.[5]

The dramatic increase in deaths due to excited delirium syndrome in the community is due to two factors. First is the increased use of illegal stimulants, such as cocaine, since the 1980s. Second is the appearance of large numbers of mentally ill individuals in the community at large. Both factors have increased the number of encounters between the police and individuals with excited delirium, and thus the number of deaths.

Changes in psychiatric care are the cause of increased numbers of the severely mentally ill being on the streets. Historically, care of the mentally ill client occurred in hospital-based facilities. This care was provided by nursing staff and was primarily custodial. Beginning in the late 1940s, detractors of mental hospitals began a campaign to replace them with community-based outpatient treatment facilities.[6] This campaign was aided by the introduction in the 1950s of psychotropic drugs for the treatment of severe mental disease.[7-9] This led to the widespread release of formerly institutionalized patients into the community. Community-based facilities were intended to reduce long-term institutionalization of mentally ill patients and provide comprehensive care focused on prevention and rehabilitation. While marvelous in concept, adequate financing by both the federal and local governments never occurred. Thus, communities now contain large numbers of mentally ill individuals who have stopped taking their medications. If these individuals become a public nuisance or violent, the police are summoned. The mentally ill then end up in either jail or the emergency room of a local hospital. The most common cause of violent behavior in the mentally ill is recurrence of psychotic symptoms due to non-adherence to antipsychotic medications and/or the use of illicit drugs and/or alcohol.[10,11]

## LAW ENFORCEMENT

The prevention of deaths due to excited delirium syndrome by the police is somewhat problematic as law enforcement personnel are presented with situations that have greater lethal potential and more unknown elements than those involving mental health facilities. The individuals they encounter who are susceptible to excited delirium syndrome constitute a subgroup of the population that has a greater potential for violence. High-risk factors possessed by this group are chronic use of illicit drugs, a criminal history, a prior history of violence, and possible possession of weapons.

Complicating the situation for the police is the fact that officers are usually unaware of an individual's past medical history, mental history, history of violence, and whether the individual is on drugs. This is in contrast to the psychiatric staff in a mental institution. Here a prior mental health and behavior history provides staff with a measure for violence prevention and safety with potentially violent patients. This is especially true in regard to a history of violence. One of the most important elements in determining if an individual has the potential for violent behavior *is a prior history of violent behavior.*[11-13]

As the concept of excited delirium syndrome and its cause and mechanism of death is unknown to law enforcement officers, their actions in

the arrests of violent offenders experiencing excited delirium do not take into account the risk potential for death of these offenders. Their actions, which are derived from police protocol and training, are deficient in mental and behavioral health practices and techniques for the handling of psychotic individuals, whether the psychosis is due to mental disease or abuse of drugs. Their lack of knowledge, and unintentionally inappropriate practices in attempting arrest, may trigger a fatal situation.

A police officer must make rapid assessments of an individual's mental state as it relates to the potential for violence. This is true whether the excited delirium is due to intrinsic mental disease or drugs. Psychiatric assessment skills used to identify behavioral, cognitive, and emotional characteristics that signal the potential for immediate or future violence are not generally taught in law enforcement training programs. Evaluation of a patient's behavior, mood, and affect is a vital part of mental health skills taught to psychiatric medical personnel. The lack of training in mental health issues related to violent offenders, who may or may not have mental illness, is a serious deficiency in the training of police officers who often face such individuals daily in communities. Law enforcement training protocols should incorporate adequate psychiatric mental health training techniques in managing individuals who either have mental illness or may be displaying symptoms of such due to drugs.

The authors watched a video entitled "Verbal Judo" that is commonly used by police training agencies nationwide.[14] This tape is used to show officers how to handle difficult individuals they encounter in communities. While the tape offers some appropriate information, it does not address issues of violence related to mental illness and drug use, which is the key element of sudden deaths in police custody arrests.

The last resort for control of violent behavior by law enforcement is use of physical restraint. This may be preceded by use of chemicals such as pepper spray. In the cases of excited delirium syndrome seen by the authors, the individuals seem unaffected by such chemicals. The only thing that their use seems to accomplish is to increase their aggravation and violence. Taser use is becoming more widespread. Its ability to abort an episode of excited delirium and prevent a death due to excited delirium syndrome is open to question.

In attempting to restrain violent individuals, police endure a significant handicap in that unlike a psychiatric team, which has five to six trained individuals who are called to a code to physically restrain a violent patient, there may only be one or two officers to attempt restraint. Backup support is often not immediately available in many communities because of a lack of officers. Anyone who has ever attempted to physically restrain psychotic violent individuals will tell you how extremely difficult this is and how violently they fight. During this struggle, the individual may be spitting,

biting, punching, head butting, kicking, and reaching for whatever is available to harm the officer. Rapid control of this individual is of vital importance to prevent harm to the officers as well as other bystanders.

This violent scene is similar to episodes of excited delirium (commonly referred to as acute psychotic episodes) seen in mental institutions where codes are often called by nursing staff to restrain the violent psychotic patient. The difference is that in mental health facilities the potential for violent behavior may be diffused by other techniques or medication. Whether on the street or in the hospital, however, gaining rapid control of the individual so as to reduce the time of the struggle is of paramount importance in preventing death from excited delirium.

Following a struggle and use of restraint, cardiopulmonary arrest due to excited delirium syndrome may occur at the scene, during transport to jail in a police vehicle, during transport to a hospital by either a police vehicle or EMS, on arrival at a jail or on arrival at the hospital. Typically, these individuals are males between the ages of 16 and 44 years.[15] Most cardiac arrests seem to occur following use of restraint, after the individual stops fighting against the restraint. This would of course correspond to the "period of peril," described by Dimsdale et al.[16] The vast majority of deaths occur at the scene (48%), less commonly during transport (29%), and only occasionally after arrival at a hospital or jail (16%).[15]

If the individual has not arrested at the scene or during transport, upon arrival at the emergency room, the individual is violent, agitated, and fights furiously with medical personnel. The emergency room personnel will maintain restraint and then administer antipsychotic and tranquillizing medications, e.g., lorazepam, intramuscularly. Early intervention by EMS personnel by use of sedative medications at the scene or during transport is usually not provided before arrival at the emergency hospital facility. Rapid administration of sedative medications at the scene may in fact prevent such deaths. The delay in administration of medication at the scene is aggravated by the fact that administration of medication in the emergency room is typically by the intramuscular route, with the associated delay in attaining effective blood levels seen with this route of administration. Giving an injection intravenously in an individual who is fighting furiously is extremely difficult, and may in fact not be feasible, but if possible should occur.

The usefulness of antipsychotic medications, e.g., haloperidol, in these cases is questionable and potentially dangerous. Symptoms of psychotic behavior are usually the result of illicit drug use and not underlying mental disease; therefore, antipsychotic medications are unnecessary. Their use should be considered only after the individual is calm, with stable vital signs and no longer at risk for sudden death due to excited delirium syndrome.

Antipsychotic medications can cause prolongation of the QT interval.[17–21] If given during a time of extreme catecholamine surges, such as occurs during excited delirium, they carry a lethal potential. Prolongation of the QTc interval has been shown to substantially increase the risk of cardiac dysrhythmias. These drugs may be used in association with antidepressants, which also cause prolongation of the QT interval.[17,20]

The authors suggest that the use of antipsychotics for excited delirium be further evaluated. The administration of sedative medications *at the scene* by EMS personnel as a preventive measure against excited delirium syndrome should be explored.

## PREVENTION

Material addressing the management and prevention of violent behavior and the potential for death of individuals in excited delirium must be incorporated into educational programs aimed at police, EMS personnel, and emergency room staff. Coordinating and standardizing training programs between medical and law enforcement for identifying symptoms of excited delirium syndrome and instituting prevention strategies within law enforcement agencies nationwide will reduce the potential for such deaths.

To prevent deaths from excited delirium syndrome, the police must:

- Identify individuals in excited delirium
- Attempt to de-escalate the situation and calm them down
- Use overwhelming force if restraint must be used
- After individuals are restrained, monitor them at the scene and during transport
- Immediately transport them to a hospital for treatment and/or observation

Early identification of symptoms and signs present in cases of excited delirium syndrome will provide the police and EMS personnel with a way of detecting potential cases of excited delirium syndrome and, thus, institute measures that can prevent such deaths. The responders can initiate measures aimed at preventing escalation of agitation and violence. Physical intervention should only be a last resort and responders must be prepared for the potential for death to occur.

The presenting behavioral and cognitive symptoms and signs may occur rapidly, and without any noticeable precipitating factors. They may continue to escalate in intensity no matter what is the method of intervention. Behavioral and cognitive indicators for death due to excited delirium syndrome are as follows:

- Extreme agitation and restlessness
- Incoherent and rambling speech
- Hallucinations
- Delusions with paranoid features
- Disorganized thought content
- Bizarre behavior
- Combativeness
- Violence

This behavior may be related to mental illness and/or the use of illicit drugs. Schizophrenia and mania related to bipolar disease have been the most identified mental illnesses associated in death due to excited delirium syndrome. The most common drugs linked to sudden death are methamphetamine and cocaine.

Mental health facilities are designed so as to create the safest possible environment for patients and staff in order to manage the risk potential for violent incidents. In contrast, the police are faced with numerous environmental factors that cannot be anticipated and that may precipitate or escalate a situation into a violent incident. Instead of operating in a safe environment, the police must attempt to create one. If two officers are present, one should be attending to environmental control while the other officer is speaking to the individual. It is important that only one officer directly makes contact verbally with the individual as well as providing a safe physical distance.

Environmental options available to police for prevention of violence include scanning the scene to remove potentially hazardous objects, removing bystanders who might escalate the individual's level of distrust and agitation, and asking others to move away from the individual to reduce stimulation. The police officers should attempt to reduce the noise level. If there is loud music playing at the scene, they should have it shut off.

An individual in acute psychosis is not experiencing reality; therefore, responders should make simple demands stated in a non-challenging manner. Listen patiently for individual response and note the level of acceptance and behavior change. At all times, communicate the willingness to help this individual regain control by statements such as "You seem upset," "We can help," "I'm here to help you," "You are safe."[23] Complement the individual's ability to maintain control and follow instructions. Offer positive feedback as the individual begins to respond in a positive manner. Individuals may pace back and forth or simulate a rocking behavior. This behavior is an attempt to reduce their agitation and should not be stopped but only watched if no violent act is imminent. Offering a cigarette to them if they smoke often will help them calm down and regain control.

Individuals who are psychotic are distrustful. Any form of crowding by attempting to surround them by officers will only escalate their already distrustful, agitated state. Make slow movements, give simple commands; wait and note the individuals' behavioral response. Do they cooperate? Is their level of agitation increasing? Scan the environment for anyone that may have a good rapport with the individual to assist. Establishing rapport and gaining trust in caring for mentally ill patients are components in psychiatric nursing. *If a struggle with a violent individual can be avoided,* death from excited delirium syndrome is avoided.

If the need to physically restrain an individual cannot be avoided by other interventions, restraint must occur rapidly to reduce the time of struggle. Law enforcement personnel should adopt the approach followed by psychiatric staff in gaining rapid control of violent patients. Five to six individuals are utilized to rapidly control the individual. Police officers may be alone or in pairs when responding to disturbances in communities. Backup support may not be available. Because of this, rapid restraint of an individual may not be possible.

Any attempt to restrain or gain physical control of a highly agitated and aggressive individual suffering from excited delirium brings with it the possibility of death. Struggling with individuals in the throes of excited delirium in order to restrain them can last as long as 30 minutes.

The majority of reported sudden deaths in nationwide studies occurred within minutes to 1 hour from initial time of struggle. No reported cases survived after experiencing cardiac arrest, **even when emergency personnel were present and advanced life support was started**.[2,15]

Quick physical control can only be gained by use of overwhelming force. A trained team of medical and law enforcement personnel experienced in physical restraint procedures should be called to the scene prior to attempting physical restraint of individuals in excited delirium. This team can provide psychiatric assessment, rapid medication, and life support if an arrest occurs at the scene. By reducing the time of struggle, and providing immediate sedative medication, the effects of the continued physiological catecholamine surge inherent in the struggle will be reduced and death may be prevented.

At all times, at the scene or during transport, **face-to-face monitoring** of the individual's breathing status **must be done by police or EMS personnel until arrival at a hospital facility**. The individual should be transported in an upright, a seated, or a side-lying position. The authors feel that in virtually all cases, extreme obesity being an exception, the position of the individual during restraint and transport plays no role in causing death. Use of the aforementioned positions is recommended only so that, if death does occur, use of these positions is a defense against an accusation of positional/restraint asphyxia.

If an individual arrests at the scene or during transport, immediate CPR, and electrocardioconversion should be initiated prior to arrival at the emergency room. If no cardiac response is obtained, the use of vasopressin has been shown to demonstrate a greater success in resuscitation of asystolic cardiac arrest than epinephrine.[4,25] The standard guideline for cardiac arrest has been the use of epinephrine as the vasoactive drug of choice in asystolic cardiac arrest. Epinephrine has been demonstrated in clinical research to consume oxygen unlike vasopressin, which increases oxygen to the myocardium. In excited delirium, there is a rapid and tremendous surge of catecholamines, epinephrine, and norepinephrine. The consumption of oxygen during this state of excited delirium further stresses the cardiac response. By virtue of these recent studies, it seems best that if chemical stimulation of the heart is required that the drug used be vasopressin rather than epinephrine.

The problems in the handling of cases by police and EMS fall into five general areas:

1. Lack of training in identifying characteristics of individuals at high risk for death due to excited delirium syndrome
2. Lack of personnel to provide rapid physical restraint so as to reduce time of struggle with an individual — ideally, a minimum of five to six individuals is necessary for rapid physical restraint
3. The inability to provide sedative medications at the scene prior to transport by emergency responders, thus, increasing the time of struggle by that spent in transport to hospital facilities for treatment
4. Lack of nationwide standardization of training programs in violence prevention and management by law enforcement and emergency personnel
5. Lack of nationwide standardization of approved procedures for restraining violent individuals within communities by law enforcement and emergency personnel

Overall, there is a lack of coordination, teaching, and input from community mental health services, law enforcement offices, emergency medical services, and emergency hospital facilities as well as medical examiner's offices in death prevention from excited delirium syndrome. Early identification and intervention equates to death prevention from excited delirium syndrome.

## EMERGENCY RESPONDERS

EMS personnel members, like the police, are routinely faced with managing, treating, and transporting violent patients. They as well as emergency room

staff are often the recipients of violent attacks from these individuals; 0.8% and 5.0% of all incidents responded to by EMS involved violence or the threat of violence.[10] Often, these violent incidents involve individuals who are mentally ill and/or on alcohol or drugs. While the risk for violence is ever present, only 25% of EMS personnel members considered themselves adequately trained to make assessments of violence.[26] In a survey by the National Association of EMS Physicians, only 47% of EMS agencies have any protocol for managing violent individuals.[26]

EMS personnel have been taught that deaths in association with excited delirium are due to positional asphyxia from improper use of restraints and/or positioning of patients. Therefore, measures to prevent such deaths are focused on preventing this non-existent asphyxia.

In reported cases of excited delirium syndrome where EMS personnel were either present at the scene or responded within minutes and employed current advanced cardiac life support (ACLS) methods for sudden cardiac arrest, no individuals survived.[2] In occasional cases, there is return of cardiac activity but invariably the individual is found to have suffered hypoxic encephalopathy and dies a few days after the original event.

There are two possibilities to explain the fact that cardiopulmonary resuscitation is invariably unsuccessful even if it is instituted immediately. The first is that cardiopulmonary arrest due to excited delirium syndrome is irreversible; the second is that the methods being used to revive individuals with excited delirium syndrome are not effective.

Because, they do not know what has triggered the physiological mechanisms causing the cardiac arrest, EMS personnel members respond to the cardiac arrest with the usual ACLS protocol, which was intended principally for cardiac arrest from heart disease. Epinephrine is a first-line medication for cardiac resuscitation.[24] However, its use in cardiac arrest due to excited delirium syndrome may not only be useless, but potentially harmful. It may increase the probability of death because excited delirium syndrome is characterized by a hyperadrenergic state. Administering epinephrine may be the equivalent of pouring gasoline on a fire.

While no research to date has been conducted regarding the use of an alternative to epinephrine for excited delirium syndrome, specifically, there has been some work of a more general nature. Vasopressin has been shown to demonstrate a greater success in resuscitation of asystolic cardiac arrest than epinephrine.[24,25] Epinephrine causes increased consumption of oxygen by the myocardium while vasopressin increases oxygen to the myocardium. In excited delirium, there is a rapid and tremendous surge of catecholamines, epinephrine, and norepinephrine. The "additional exogenous epinephrine could be expected to exacerbate hypoxemia and advancing acidosis, both of which would be expected to further impair the vasopressor effects of epinephrine as well. Thus,

epinephrine might not only be ineffectual, but also potentially detrimental in early asystolic cardiac arrest."[24]

The **timing of sedation** is a critical component in death prevention. The level of agitation that initiates the cascade of physiological events resulting in sudden cardiac arrest must be stopped. Waiting until an individual reaches an emergency room before beginning medication, assuming that the individual lives that long, is foolish. This is especially true, as reversal of the cardiac arrest due to excited delirium syndrome is rare and when it does occur results in hypoxic encephalopathy and death a few days after the original event. The only way to avoid the delay in sedation of individuals in excited delirium is to authorize EMS personnel to administer sedative medication at the scene.

## POLICE AND EMS AT THE SCENE

The following actions are recommended for all police and EMS personnel responding to a violent individual who exhibits signs of excited delirium:

- If the first responders are police officers, as soon as it is apparent that the individual is in excited delirium, they should summon EMS and request backup. If the first responders are EMS, they should summon the police, explaining the situation.
- Appoint one individual, either a police officer or an EMS worker, to attempt verbal intervention techniques in order to defuse the situation. This individual should have training in these techniques by approved providers of violence management programs. The police agency and EMS administrators should decide who in the community should receive this training. All conversation with the patient should be with this one individual. The other team members should be securing the scene and standing by to begin a fast physical restraint if it becomes necessary.
- Members of the team should remain calm even if the individual is screaming insults. The ability to be confident and in self-control helps provide "external security" for an individual who is out of control. Psychotic and highly agitated individuals will often have racing thoughts and may not hear your statements. Remain calm and restate requests until compliance is attained. Be patient. Do not take any action unless there is an immediate threat to the individual or others.
- Do not have discussions and arguments within the team regarding what is to be done and who should do it. Plan ahead for procedures. Disagreements within the team only serve to heighten the atmosphere of agitation already present.


- If confronted with a patient with a weapon, the police have to decide whether there is imminent danger. A weapon completely changes the situation. The police officers may have to resort to physical force including lethal force to protect themselves and others. If the police believe that negotiations can still continue, ask politely, never demand, that the individual place the weapon down and move away from it. Never have the individual place it in your hand. Continue to convey to the individual the importance of safety for yourself and the individual in your ability to provide medical care. Be aware of subtle changes in the individual's movements and mental status.
- Statements should always be phrased in a positive manner with offers to help and assist. Never lie unless it is absolutely necessary. If the individual discovers you have lied before being secured, the individual may react with extreme violence.
- Always be direct with statements without becoming confrontational. Be patient. It takes time for a highly agitated individual to calm down. If there is no immediate danger to the individual or yourself, allow space and time for the individual to "vent" and diffuse his or her agitation. This will often help the individual calm down.
- Try to get the individual to sit down. If people sit down, they most likely will calm down.
- Keep a safe distance, 10 to 15 feet from the individual. Never turn your back on a violent psychotic individual. If you need help, back away facing the individual. Know where the individual is at all times.
- Do not maintain eye contact continually as paranoid individuals may interpret this as a threatening behavior to them.
- If working with EMS who can give sedative medications, have the medications prepared before you begin physical restraint. One team member can be doing this while the other is trying to defuse the individual. Offer the individual oral medication initially. At first, the individual will most likely be too mentally impaired to respond to your request. After the individual regains composure, the individual may agree to take the medications offered.
- Remember that individuals with psychotic disorders are mentally impaired and when highly agitated will not comply unless they can be calmed. Highly agitated individuals who are not psychotic can make rational decisions and can be more dangerous than psychotic individuals. They may not back down when confronted with authority. They may be in a rage related to drug use or family conflicts. They will utilize any means of manipulative behavior to gain control of you and others at the scene.

- Maintain your safety and the safety of any people in the environment. Ask other people to leave the scene. Often another party will increase or be the cause of the agitation. Sometimes, another individual or family member who has gained rapport with the individual can assist you in calming the individual down.
- Remove any items in the immediate area that can be used as a weapon if possible. Attempt to move into a safe area, which is open, allows for physical retreat, without interference of objects and individuals when verbal or physical intervention is begun.
- If a verbal intervention does not work, then one must resort to restraint. The police may want to initially try to immobilize the individual with chemicals, e.g., pepper spray. This may or may not work. The authors are aware of numerous cases where chemicals have had absolutely no effect or increased the violence. The use of Tasers in these situations is still being explored.
- If physical restraint has to be employed, it should be overwhelming. The objective is to reduce the time of struggle, thus reducing catecholamine production. At least five to six people should be available to physically restrain an individual in excited delirium. The presence of five to six people as a" show of force" may stop the mentally coherent individual, but not the psychotic one. Having five to six individuals available for physical restraint allows for rapid control and reduction in time of struggle.
- Place the restrained individual in a "side-lying" recumbent position. This provides monitoring of airway and breathing. Arms and feet are secured by applying body pressure to the shoulders and above the knees. Another team member should secure the head to prevent biting. Placing an individual in the "side-lying" position, in itself, will not decrease the probability of cardiopulmonary arrest. However, it will be useful in countering claims of "positional asphyxia" if death due to excited delirium occurs.
- Total physical restraint control should occur in just a few minutes. All team members should be providing continuing monitoring for any signs of changing respiration, or diminished mental status. During the heighten atmosphere of attempting to physically restrain a very violent and angry person, it is not uncommon to get lost in the procedure and forget to monitor for changes in health status. Is the person speaking, screaming, or moaning? If people are speaking, they are also breathing even if they don't make sense. If they were able to formulate statements and questions before you attempted to restrain them, has this changed? Is their speech slurred with unrecognizable statements?

- Once the individual is secure at the scene, the individual should be immediately transported to a hospital. Before transport in the ambulance, administration of a rapid sedative is recommended. Intravenous administration produces the most rapid sedation. Lorazepam is the sedative medication of choice in emergency situations.[5,27] It can be given orally, intramuscularly, or intravascularly. Rapid sedation of aggression and agitation is a primary tool in prevention of death from excited delirium syndrome. Therefore, route of administration should be intravascular if possible. Intramuscular injections are often used first by emergency and psychiatric personnel; however, in cases of excited delirium sudden death occurs within minutes "after" the struggle ceases. If engaging in a struggle cannot be prevented, it is vitally important to reduce the time of agitation and duration of struggle in these individuals. The duration of struggle is related to the rise and fall of catecholamines and sudden death from excited delirium.
- Authorization for the use of sedative medication should be approved prior to attempting restraint.
- At all times, continue to monitor and assess vital signs. Any diminished respiratory status or rapid elevation of core body temperature may signal a danger warning for sudden cardiac arrest from excited delirium syndrome.
- Be ready to immediately begin cardiac resuscitation procedures by use of vasopressin and/or electrocardiac conversion.
- Transport all individuals experiencing excited delirium to a hospital, even if they appear to be recovering.

In preparation for the aforementioned actions, a **Psychiatric Emergency Response Team (PERT)** might be constituted within police departments. Such a team would be formed in conjunction with the EMS. It could be called upon to respond to situations where officers, after attempting preventive measures of de-escalation, need to employ physical restraint. This team would comprise five to six individuals from law enforcement and EMS. The team would be able to assist in the physical restraint of individuals as well as to immediately institute lifesaving measures if cardiac arrest occurs. The need for five to six individuals is based on experience by psychiatric teams used for codes for violent, mentally ill patients in mental institutions. A nurse might also be part of the team.

## EMERGENCY ROOMS

Individuals in the throes of excited delirium are increasingly presenting to emergency rooms, either voluntarily or involuntarily after having been

transported to the emergency room by either the police or EMS. In some cases, patients will develop excited delirium in the emergency room while there for other health problems. The excited delirium can be due to use of illegal stimulants and/or to intrinsic mental disease.

The management of these patients is the responsibility of the physicians and nurses in the emergency room. Often, this staff must make rapid physical, psychiatric, and behavioral assessments. Treatment procedures for mentally ill patients are not their area of expertise; therefore, they are usually at a disadvantage when confronted with an aggressive individual in excited delirium. They may have little or no knowledge of sudden death occurring during restraint, let alone excited delirium syndrome. The management of violent behavior in patients is initially directed at the use of physical restraints and then pharmacological sedation. Physical restraint is used to protect the individual and the medical personnel from violence; to administer medications, and to be able to perform diagnostic tests. Unfortunately, use of restraints triggers the physiological cascade that can result in sudden death.

No specific pharmacologic treatments are available to treat violent behavior in emergency departments. Typically, the patient is given an antipsychotic medication and a tranquilizer (sedating agent). The most commonly used drugs are lorazepam (a benzodiazepam) and haloperidol.[28] Both drugs can be given orally, intramuscularly, and intravenously. The usual route of administration is intramuscular. Unfortunately, response to intramuscular administration of sedative medication such as lorazepam is in the range of 15 to 30 minutes, minimally. In cases of sudden death due to excited delirium syndrome, the individuals often go into cardiac arrest before the medication can be effective. The route of choice in these patients should be intravenous, for rapidly acting sedation. Unfortunately, because of violent struggling it is often not possible to give drugs intravenously.

Haloperidol, like lorazepam is also given intramuscularly. It also has a significant delay time before producing an effect. In addition, it has the potential to cause prolongation of the QT interval, predisposing patients to sudden cardiac death. This attribute is even worse if it is given intravenously.[21] If the patient is on another medication that also predisposes him or her to QT prolongation, such as a tricyclic antidepressant or erythromycin, there may be potentiation of the effects of haloperidol on QT prolongation.

It is not necessary during an episode of excited delirium to treat the underlying psychosis, if present, by the use of antipsychotic medications. This concept may appear strange to those medical personnel who have always used antipsychotics to reduce psychosis and agitation. There is in fact no immediate urgency in treating an underlying psychosis. The immediate medical problem is not the psychosis but the violent behavior


of the individual and the possibility of sudden death. The other fact to remember is that most individuals in excited delirium have this condition due to use of illicit drugs and not underlying mental disease. Once the drugs have been metabolized, the individual will return to their normal state.

It is only when the cause of the excited delirium is mental illness that the antipsychotic medication is medically warranted. These individuals usually develop their excited delirium as a result of noncompliance with medication. For antipsychotic medication to be effective, a number of hours or days has to pass. If given initially at admission, by the time the antipsychotic medication would become effective, the patient might already be dead from excited delirium syndrome.

If the patient goes into cardiopulmonary arrest in the emergency room, in view of the prior discussion in this chapter on epinephrine, it would be advisable to use vasopressin for resuscitation.[24,25]

## REFERENCES

1. O'Halloran, R.L. and Frank, J.G. Asphyxial death during prone restraint position revisited: a report of 21 cases. *Am. J. Forensic Med. Pathol.* 21(1):39–52, 2000.
2. Stratton, S.J., Rogers, C., Brickett, K., and Gruzinski, G. Factors associated with sudden death of individuals requiring restraint for excited delirium. *Am. J. Emerg. Med.* 19(3):187–191, 2001.
3. Chan, T.C., Vilke, G.N., Neuman, T., and Clausen, J.L. Restraint position and positional asphyxia. *Ann. Emerg. Med.* 30:578–586, 1997.
4. Chan, T.C., Neuman, T., Clausen, J., Eisele, J., and Vilke, G.M. Weight force during prone restraint and respiratory function. *Am. J. Forensic Med. Pathol.* 25:185–189, 2004.
5. Citrome, L. and Volavka, J. Violent patients in the emergency setting. *Psychiatr. Clin. North Am.* 22(4):789–801, 1999.
6. Groh, G.N. Mental health policy in America: myths and realities. *Health Affairs* 11(3):7–22, 1992.
7. Cancro, R. The introduction of neuroleptics: a psychiatric revolution. *Psychiatr. Serv.* 51(3):333–335, 2000.
8. Lieberman, J.A., Golden, R., Stroup, S., and McEnvoy, J. Drugs of the psychopharmacological revolution in clinical psychiatry. *Psychiatr. Serv.* 51(10) 1254–1258, 2000.
9. Wendkos, M.H. *Sudden Death and Psychiatric Illness.* SP Medical & Scientific Books, New York, 1979.
10. Brice, J.H., Pirrallo, R.G., Racht, E., Zachariah, B.S., and Krohmer, J. Management of the violent patient. *Prehosp. Emerg. Care* 7(1):48–55, 2002.
11. Tardiff, K. The current state of psychiatry in the treatment of violent patients. *Arch. Gen. Psychiatr.* 49(6):493–499, 1992.
12. Blumenreich, P., Lippmann, S., and Bacani-Oropilla, T. Violent patients. Are you prepared to deal with them? *Postgrad. Med.* 90(2):201–206, 1991.
13. Owen, C., Tarantello, C., Jones, M., and Tennant, C. Violence and aggression in psychiatric units. *Psychiatr. Serv.* 49(11):1452–1457, 1998.
14. Thompson, G.J. Verbal Judo for Police (Video Tape), Auburn, New York, 2000.

15. Ross, D.L. Factors associated with excited delirium deaths in police custody. *Mod. Pathol.* 11(11):1127–1137, 1998.
16. Dimsdale, J.E., Hartley, G.T., Guiney, T., Ruskin, J.N., and Greenblatt, D. Post-exercise peril: plasma catecholamines and exercise. *J. Am. Med. Assoc.* 251:630–632, 1984.
17. Glassman, A.H. and Bigger, J.T., Jr. Antipsychotic drugs: prolonged QTc interval, torsade de pointes, and sudden death. *Am. J. Psychiatr.* 158(11):1774–1782, 2001.
18. Herxheimer, A. Arrhythmias and sudden death in patients taking antipsychotic drugs. *Br. Med. J.* 325:1253–1254, 2002.
19. Fayek, M., Kingsbury, S.J., Zada, J., and Simpson, G.M. Psychopharmacology: cardiac effects of antipsychotic medications. *Psychiatr. Serv.* 52:607–609, 2001.
20. Witchel, H., Hancox, J.C., and Nutt, D.J. Psychotropic drugs, cardiac arrhythmia, and sudden death. *J. Clin. Psychopharmacol.* 23(1):58–77, 2003.
21. Hassaballa, H.A. and Balk, R.A. Torsade de pointes associated with the administration of intravenous haloperidol: a review of the literature and practical guidelines for use. *Expert Opin. Drug Saf.* 2(6):543–547, 2003.
22. Roden, D.M. Drug-induced prolongation of the QT interval. *N. Engl. J. Med.* 350(10):1013–1022, 2004.
23. Citrome, L. and Green, L. The dangerous agitated patient. What to do right now. *Postgrad. Med.* 87(2):231–236, 1990.
24. McIntyre, K.M. Vasopressin in asystolic cardiac arrest. *N. Engl. J. Med.* 350(2):179–181, 2004.
25. Wenzel, V., Krismer, A.C., Arntz, H.R., Sitter, H., Stadlbauer, K.H., and Lindner, K.H. European Resuscitation Council Vasopressor during Cardiopulmonary Resuscitation Study Group. A comparison of vasopressin and epinephrine for out-of-hospital cardiopulmonary resuscitation. *N. Engl. J. Med.* 350(2):105–113, 2004.
26. Tintinalli, J.E. and McCoy, M. Violent patients and the prehospital provider. Erratum appears in *Ann. Emerg. Med.* 22(8):1276–1279, 1993.
27. Citrome, L. Atypical antipsychotics for acute agitation. New intramuscular options offer advantages. *Postgrad. Med.* 112(6):85–88, 94–96, 2002.
28. Binder, R.L. and McNiel, D.E. Emergency psychiatry: contemporary practices in managing acutely violent patients in 20 psychiatric emergency rooms. *Psychiatr. Serv.* 50:1553–1554, 1999.