# EXHIBIT 1

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 2 2 2005

at __3__ o'clock and __30__ min __P__ M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| MICHAEL GAINES and DANA ADAMS, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>COUNTY OF MAUI and DOE DEFENDANTS 1-100, )<br><br>Defendants. ) | CIVIL NO. 04-00518 HG-LEK<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' FEDERAL LAW CLAIM AND REMANDING STATE LAW CLAIMS** |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' FEDERAL LAW CLAIM AND REMANDING STATE LAW CLAIMS**

Plaintiffs Michael Gaines and Dana Adams bring a 42 U.S.C. §
1983 claim alleging excessive force and false arrest/imprisonment
and eight state law tort claims against the County of Maui
("County" or "Defendant").  The police stopped Plaintiffs'
vehicle, using a "high risk felony traffic stop" technique,
because its description and license plate number matched that of
a vehicle that had been involved in a residential burglary and
other felonies.  The Plaintiffs turned out not to be the

1

suspects.  The police released Plaintiff Adams, but arrested Plaintiff Gaines pursuant to an outstanding warrant.  The next day, the police discovered that the warrant had been recalled and released Plaintiff Gaines.  Defendant has moved for summary judgment on all claims.

The Court grants Defendant's Motion for Summary Judgment on Plaintiffs' Section 1983 claim (Count I).  With regard to Plaintiffs' excessive force allegations, the Court holds that Defendant's use of force was objectively reasonable as a matter of law.  With regard to Plaintiff Gaines' false arrest/imprisonment allegations, the Court finds that the police arrested Plaintiff Gaines pursuant to a facially valid warrant and Plaintiff has not shown that the police have an established warrant tracking policy that was deliberately indifferent to Plaintiff's constitutional rights.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Counts Two through Nine of the Complaint are REMANDED to the Hawaii state court.

### Procedural History

On July 15, 2004, Plaintiffs filed a complaint in the Circuit Court of the Second Circuit, State of Hawaii.

On August 23, 2004, Defendant removed the case from state court and the complaint was filed in this Court.

On April 27, 2005, Defendant filed a motion for summary judgment and a concise statement of facts in support of the motion. ("Defendant's Motion").

On June 23, 2005, Plaintiffs filed a memorandum in opposition to the Motion for Summary Judgment and a concise statement of facts in support of the memorandum. ("Plaintiffs' Opposition").

On June 30, 2005, Defendant filed a reply memorandum in support of its Motion for Summary Judgment. ("Defendant's Reply").

On July 11, 2005, the matter came on for hearing.

### Background

Plaintiffs allege violations of 42 U.S.C. § 1983 (Count I), and various state law claims (Counts II – IX). Plaintiffs' Complaint is against the County of Maui only, and not any individual police officers.[1]

Plaintiffs' Section 1983 claim is based on the County allegedly having an unconstitutional policy or custom: (1) of using excessive force during high risk traffic stops; and (2) of failing to employ adequate procedures to determine if warrants

---

[1] Although Plaintiffs name "Doe Defendants 1-100" in their Complaint, they never amended the Complaint to name any other parties.

3

have been recalled.

## I.   Undisputed Facts[2]

The material facts are undisputed.   On April 29, 2004, the police stopped Plaintiffs' car because it matched the description of a vehicle that had been identified as having been involved in felony offenses.   The car was a gray Nissan with license plate FYA 103.

The felonies took place on February 24, 2004.   (See Affidavit of Donald Simpson at ¶ 4 ("Simpson Aff."); Declaration of Conrad Bolor at ¶ 3 ("Conrad Decl.").)   Phillip Floyd discovered that his credit cards had been stolen from his condominium while he was sleeping and his rental car had been broken into.   (Simpson Aff. at ¶ 4.)   At approximately 6:00 a.m. on that same day, a male and female went to the Safeway grocery store in Lahaina, Maui and charged $939.30 worth of goods to Mr. Floyd's credit card.   (Simpson Aff. at ¶ 5; Conrad Decl. at ¶ 3.)

The cashier who rang up the sale was suspicious because the signature on the sales slip did not match the signature on the

_____

[2] Plaintiffs have not fully complied with Local Rule 56.1 concerning the proper format for concise statements of fact in support of motions for summary judgment.   Plaintiffs' concise statement is not numbered to correspond with Defendant's numbered concise statement and does not specifically state whether Plaintiffs dispute each of Defendant's numbered statements of fact.   The factual allegations of Defendant's concise statement that are not contradicted by Plaintiff's factual allegations are deemed admitted.   See Local Rule 56.1(g).

card.  (Conrad Decl at ¶ 3.)  Mr. Bolor followed the man and woman and saw them get into a dark colored car with license plate number FYA 103.  (Conrad Decl. ¶¶ 4-6.   Mr. Bolor wrote the license plate number on his hand.  (Conrad Decl. at ¶ 6.)  The police were then called.  (Simpson Aff. at ¶¶ 6-7; Conrad Decl. at ¶ 6.)

The police opened cases for the crimes of Burglary in the First Degree, Unauthorized Entry Into a Motor Vehicle, Theft in the Second Degree, and Fraudulent Use of a Credit Card.  (Simpson Aff. ¶¶ 4-5.)  These are felony offenses.  Detective Donald Simpson was assigned to the case.  He obtained information on the suspects and the vehicle and issued an All Points Bulletin to all police stations on Maui.  (Simpson Aff. at ¶ 8.)  All Points Bulletins for a dark gray Nissan Maxima, with license plate number FYA 103 were issued on February 24, 2004, March 29, 2004, and April 12, 2004.  (Simpson Aff. at ¶ 8.)

On April 29, 2004, Detective Simpson spotted a gray Nissan with license plate number FYA 103.  (Simpson Aff. at ¶ 9.)  He was not in a vehicle equipped with lights so he called for assistance to stop the vehicle.  (Simpson Aff. at ¶ 11.)  Plaintiff Gaines was driving the vehicle and Plaintiff Adams was the only passenger.

Two police officers, Officer Joshua Haglan and Officer Ryan Pursley responded to Detective Simpson's request for assistance

5

to stop the vehicle.[3]  (Simpson Aff. at ¶ 12.)  The officers used a "high risk felony traffic stop" technique to have the occupants exit the vehicle.  (See Affidavit of Officer Haglan at ¶ 5 ("Haglan Aff.") and Affidavit of Officer Pursley at ¶ 5 ("Pursley Aff.").)

The police officers approached Plaintiffs with weapons drawn and pointed at them.  (Declaration of Michael Gaines at ¶ 4 ("Gaines Decl.").)  Officer Haglan unholstered his firearm, took cover behind the driver's side of the vehicle, and instructed the driver to raise his hands and exit the vehicle slowly.  (Haglan Aff. at ¶ 6.)  Officer Haglan recognized Plaintiff Gaines, the driver, from prior contact and did not feel that he was a threat to his safety.  (Haglan Aff. at ¶ 7.)  Officer Haglan then re-holstered his firearm and had Plaintiff Gaines walk to the back of the Nissan where he handcuffed him.  (Haglan Aff. at ¶ 7; Gaines Decl. at ¶ 6; Defendant's Reply at Exhibit M (Deposition of Michael Gaines at p. 29, lines 17-23).)  During deposition, Plaintiff Gaines testified that Officer Haglan "kept everybody away from [Plaintiff Gaines] . . .".  (Defendant's Reply at Exhibit M (Deposition of Michael Gaines at p. 29, lines 23).)

Officer Pursley pointed his firearm at the direction of the

---

[3] While at the scene, two other patrol vehicles stopped to see if the officers needed assistance, but left after they saw that the officers did not need assistance.  (Haglan Aff. at ¶ 11.)

passenger side of the vehicle and instructed the passenger to exit the vehicle by holding up her hands and exiting slowly. (Pursley Aff. at ¶ 6.) When the passenger, Plaintiff Adams, was out of the vehicle, Officer Pursley instructed her to lie face down on the ground, cross her feet and put them up near her buttocks, and extend her arms out to the sides of her body. (Pursley Aff. at ¶ 9; Decl. of Dana Adams "Adams Decl." at ¶ 6.) Officer Pursley then approached the passenger with his firearm drawn. (Pursley Aff. at ¶ 10.) According to Plaintiff Adams, Officer Pursley held his gun closer than one foot distance from her head. (Adams Decl. at ¶ 6.) As he was able to get hold of one of Plaintiff Adam's wrists, he re-holstered his firearm. (Pursley Aff. at ¶ 10.) He then handcuffed Plaintiff Adams, did a visual search for weapons, and had her stand up. (Pursley Aff. at ¶ 10.) Plaintiffs were unarmed and complied with police orders. (Adams Decl. at ¶ 5.)

Within a few minutes, Detective Simpson arrived at the scene and told the police officers that the occupants of the vehicle did not meet the description of the people they were looking for. (Haglan Aff. at ¶ 10; Pursley Aff. at ¶ 11.)

The officers ran a warrant check on both Plaintiffs because they were in a vehicle linked to criminal activity. (Simpson Aff. at ¶ 15.) When no warrant was found for Plaintiff Adams, Officer Pursley informed her that she was free to leave.

7

(Pursley Aff. at ¶ 12; Simpson Aff. at ¶ 17.)  A warrant for Plaintiff Gaines was confirmed by Dispatch and Officer Haglan placed him under arrest.  (Simpson Aff. at ¶ 16; Haglan Aff. at ¶ 12; Defendant County of Maui's Concise Statement of Facts in Support of Its Motion for Summary Judgment at Exhibit A ("Bench Warrant").)

Officer Haglan arrested Plaintiff Gaines at approximately 5:00 p.m. on April 29, 2004.  Plaintiff Gaines told the officers that the warrant was invalid.  (Gaines Decl. at ¶ 13.)  There was no further effort to check the validity of the warrant at that time.  (Gaines Decl. at ¶ 14.)  There is some dispute as to how law enforcement officials discovered the next morning that the warrant had been recalled.  (See Plaintiffs' Opposition at 18.) But, it is undisputed that the Sheriff released Plaintiff Gaines the morning after his arrest (on April 30, 2004) when it became apparent that the arrest warrant had been recalled.  (Gaines Decl. at ¶ 15.)

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  There must be sufficient evidence that a reasonable jury could return a verdict for the nonmoving party.  Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996).

The moving party has the initial burden of "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party, however, has no burden to negate or disprove matters on which the opponent will have the burden of proof at trial. The moving party need not produce any evidence at all on matters for which it does not have the burden of proof. Celotex, 477 U.S. at 325. The moving party must show, however, that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. That burden is met simply by pointing out to the district court that there is an absence of evidence to support the nonmovant's case. Id.

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of probative evidence tending to support its legal theory. Commodity Futures Trading Comm'n v. Savage, 611 F.2d 270, 282 (9th Cir. 1979). The opposing party must present admissible evidence showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). "If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." <u>Nidds</u>, 113 F.3d at 916 (quoting <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)).

The court views the facts in the light most favorable to the
non-moving party. <u>State Farm Fire & Casualty Co. v. Martin</u>, 872
F.2d 319, 320 (9th Cir. 1989).

Opposition evidence may consist of declarations, admissions,
evidence obtained through discovery, and matters judicially
noticed. Fed. R. Civ. P. 56(c); <u>Celotex</u>, 477 U.S. at 324. The
opposing party cannot, however, stand on its pleadings or simply
assert that it will be able to discredit the movant's evidence at
trial. Fed. R. Civ. P. 56(e); <u>T.W. Elec. Serv.</u>, 809 F.2d at 630.
The opposing party cannot rest on mere allegations or denials.
Fed. R. Civ. P. 56(e); <u>Gasaway v. Northwestern Mut. Life Ins.</u>
<u>Co.</u>, 26 F.3d 957, 959-60 (9th Cir. 1994). Nor can the opposing
party rest on conclusory statements. <u>National Steel Corp. v.</u>
<u>Golden Eagle Ins. Co.</u>, 121 F.3d 496, 502 (9th Cir. 1997).

## <u>Analysis</u>

### I.    Defendant's Motion to Strike

In its reply, Defendant moves to strike Plaintiffs': Exhibit
1 (County of Maui Administrative Inquiry #04-048); Exhibit 3
(Second Amended Complaint in <u>Kaina, et al. v. County of Maui, et</u>
<u>al.</u>, Civil No. 04-00608); Exhibit 4 (Declaration of Joseph
Crisafulli); Exhibit 5 (Plaintiffs' Scheduling Conference
Statement in <u>Gregory, et al. v. County of Maui</u>, Civil No. 04-

00516); and the Declaration of Dana Adams.

Defendant's motion to strike is **GRANTED** with respect to the remedial measures recommended on the pages bates stamped 0000051 and 0000068 of Exhibit 1 and as to Exhibits 3, 4, and 5. Defendant's motion to strike is **DENIED** with respect to the remainder of Exhibit 1 and Plaintiff Adams' Declaration.

A.   **Exhibit 1**

Exhibit 1 to Plaintiffs' Concise Statement of Facts documents the County of Maui's administrative inquiry into the traffic stop of Plaintiffs and the arrest of Plaintiff Gaines. The administrative inquiry concludes that there was no culpability on the part of the County of Maui because the Wailuku District Court did not inform the County of the recalled warrant. The handwritten comments on the page bates stamp numbered 0000068[4] and typed comment number 1 under "Recommended Follow-Up" on the page bates stamp numbered 0000051[5] pertain to subsequent remedial measures.

_____

[4] The handwritten comment on page 0000068 of Exhibit 1 to Plaintiffs' Concise Statement of Facts states "[w]e need to set up a meeting with the District Court to decide on a better procedure for notification of recalls, as well as a follow-up system."

[5] The typed comment on page 0000051 of Exhibit 1 to Plaintiffs' Concise Statement of Facts states: "Determine if a follow-up meeting was conducted between Captain Lawrence HUDSON and Judge Rhonda LOO on the matter to ensure/develop better warrant recall policy."

11

Because Plaintiffs seek to introduce these portions of the County's administrative inquiry to prove culpable conduct by the County they are inadmissible under Fed. R. Evid. 407 as subsequent remedial measures.  The portions of the County's administrative inquiry pertaining to subsequent remedial measures are also inadmissible under Fed. R. Evid. 403 because their probative value is substantially outweighed by the danger of unfair prejudice to the County and confusion of the issues.  The County's consideration of undertaking subsequent remedial measures is irrelevant to the County's liability to Plaintiffs, if any, in this case.  See Maddox v. City of Los Angeles, 792 F.2d 1408, 1417 (9th Cir. 1986)(Internal Affairs investigation and measures taken by the defendant City were remedial measures taken after the incident properly excluded pursuant to Fed. R. Evid. 403 with respect to the City's liability.); see also Luera v. Snyder, 599 F. Supp. 1459, 1463 (D.C. Col. 1984) (testimony of changes in police department's policies are inadmissible as evidence of a subsequent remedial measure).

The Court, however, does not exclude the entire administrative inquiry.  See Fasanaro v. Mooney Aircraft Corp., 687 F. Supp. 482, 487 (N.D. Cal. 1988)(citing Rocky Mountain Helicopters v. Bell Helicopters, 805 F.2d 907, 918-19 (10th Cir. 1986)) (when an investigative report recommends remedial measures, only the portions concerning the remedial measures are

inadmissible).  Although the administrative inquiry contains
hearsay and opinion evidence that would be inadmissible at trial,
a summary judgment movant does not have to present evidence in a
form that would be admissible at trial if the evidence presented
is capable of being reduced to an admissible form.  See Fonseca
v. Sysco Food Serv. of Ariz., Inc., 374 F.3d 840, 846 (9th Cir.
2004); Fraser v. Goodale, 342 F.3d 1032, 1036-37 (9th Cir. 2003).
The portions of pages bates stamp numbered 0000051 and 0000068 of
Exhibit 1 specified above are **STRICKEN**.

### B.    Exhibit 3 and Exhibit 5

Exhibits 3 and 5 are filings by Plaintiffs' attorneys in
unrelated cases.  Exhibit 3 is a complaint in a case against the
County of Maui alleging excessive force, Megan Kaina et al. v.
County of Maui et al., CV 04-00608 DAE-LEK.  The complaint
alleges that, three months prior to the incident in the present
case, a female motorist was shot dead at point blank range by an
officer of the Maui Police Department during a traffic stop.

Exhibit 5 is a scheduling conference statement in Gregory et
al. v. County of Maui, CV 04-00516 SPK-KSC, another excessive
force case against the County of Maui.  The case involves
allegations that the County of Maui caused the death of Richard
Gregory by using excessive force while arresting him.  The arrest
did not involve a traffic stop.  Plaintiffs offer Exhibits 3 and
5 as evidence that the County had a custom or policy of

conducting unreasonable searches and seizures.

Exhibits 3 and 5 are not evidence. <u>See</u> Fed. R. Evid. 401 and 402. They are documents from other lawsuits filed by Plaintiffs' attorney. The allegations made in these documents are not in a form that would be admissible at trial. Exhibits 3 and 5 are **STRICKEN**.

C.    **Exhibit 4**

Exhibit 4 is the Declaration of Joseph Crisafulli, an individual who claims that the Maui police used excessive force in questioning him about a fight outside a nightclub. The Court excludes Exhibit 4 under Fed. R. Evid. 401 and 403 because it is irrelevant and unduly prejudicial. Plaintiffs apparently rely on it to support their argument that the County has a policy of using excessive force during high risk traffic stops. Exhibit 4 does not deal with the use of force during traffic stops. It bears no relevance to this issue. It is unduly prejudicial to the County because Exhibit 4 contains allegations of police brutality in an entirely separate and unrelated incident. The Court **STRIKES** Exhibit 4.

D.    **Plaintiff Adams' Declaration**

Defendant argues that the Court should disregard the Declaration of Dana Adams because it is contradicted by her prior deposition testimony in two respects. First, in paragraph 10 of

14

her declaration, Plaintiff Adams states that she was so terrified that she had a bowel movement in her pants.  During deposition, Plaintiff Adams clarified that she did not have a bowel movement. (See Defendant's Reply at 5 and at Exhibit D ("Deposition of Dana Adams" at 72-73).)  Second, in paragraph 12 of her declaration, Plaintiff Adams claims that she continues to suffer panic attacks, nightmares, and stress related problems.  During deposition, Plaintiff Adams testified that she has suffered from nightmares and emotional problems in the past, prior to the incident.  (See Defendant's Reply at 5-6 and at Exhibits E and F.)

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991).  Courts must be sure an affidavit both contradicts prior testimony and is an attempt to "create" an issue of fact before disregarding the affidavit as a "sham."  Id. at 267.

The inconsistencies Defendant highlights do not warrant striking Plaintiff Adams' Declaration.  Plaintiff Adams signed her declaration on June 16, 2005.  Plaintiff Adams' deposition testimony was taken on June 22, 2005.  Plaintiff Adams' Declaration and her deposition testimony are not contradictory. Rather, Plaintiff Adams' deposition testimony provides more

detail regarding the statements made in her declaration.  Based on these facts, the Court finds that Plaintiff Adams' Declaration is not a sham.

## II.  Defendant's Motion for Summary Judgment

### A.  Plaintiffs' Section 1983 Claim (Count I)

Under Section 1983 "[e]very person who, under color of [state law], ... [deprives] any citizen of the United States ... of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." McKenzie v. Lamb, 738 F.2d 1005, 1007 (9th Cir. 1984) (quoting 42 U.S.C. § 1983)).

The basis for Plaintiffs' Section 1983 claim is that the Maui County police: (1) have a policy or custom of using excessive force in conducting high risk traffic stops; and (2) have an unconstitutional policy in determining whether a warrant has been recalled.

A county is subject to suit under Section 1983 for monetary, declaratory, or injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690 (1978). A "policy" is a deliberate choice to follow a course of action and can be one of action or inaction. Fairley v. Luman, 281 F.3d

16

913, 918 (9th Cir. 2002).  A county may also be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell, 436 U.S. at 691.  A county may not, however, be sued under Section 1983 for an injury inflicted solely by its employees or agents.  Id. at 694.

Before considering whether the allegedly unconstitutional action was taken pursuant to a policy or custom, the Court must determine whether there was, in the first instance, a violation of a constitutional right.  If there was no violation of a constitutional right, then "the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."  City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

### 1.  Excessive force

The Fourth Amendment guarantees citizens the right "to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV.  In Graham v. Connor, 490 U.S. 386, 395 (1989), the U.S. Supreme Court held that all claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other seizure of an individual should be analyzed under the Fourth Amendment's "objective reasonableness" standard.  Excessive force is force that is not

17

"objectively reasonable" in light of the facts and circumstances confronting the officer. Graham, 490 U.S. at 397.

In determining whether force used in a particular seizure is "reasonable" under the Fourth Amendment requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Graham, 490 U.S. at 396 (citations and quotations omitted).

The Ninth Circuit Court of Appeals breaks the "objective reasonableness" balancing test into three steps: (1) the gravity of the intrusion is evaluated by assessing the type and amount of force used; (2) the government interests at stake are evaluated by considering the severity of the crime at issue, whether the suspect poses a threat to the safety of the officers or others, and whether the suspect is resisting arrest; and 3) the gravity of the intrusion on the individual is balanced with the government interests to determine if the force used was constitutionally reasonable. See Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003). All of these considerations are judged from the perspective of a "reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Arpin v. Santa Clara Valley Transportation, 261 F.3d 912, 921 (9th Cir. 2001).

Although reasonableness is normally a jury question

18

"defendants can still win on summary judgment if the district court concludes after resolving all facts in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." <u>Alexander v. County of Los Angeles</u>, 64 F.3d 1315, 1322 (9th Cir. 1995) (citations and quotations omitted); <u>Miller</u>, 340 F.3d 959 (upholding summary judgment for county on excessive force claim where use of dog to bite and hold plaintiff's arm did not constitute excessive force); <u>Jackson v. City of Bremerton</u>, 268 F.3d 646 (9th Cir. 2001) (upholding summary judgment in favor of city on excessive force claim where police sprayed plaintiff with chemical irritant, pushed her to the ground to handcuff her, placed in her the patrol car, rolled up the windows, and turned on the engine in the July heat to "adjust [her] attitude").

### a.    *The Gravity of Intrusion on Plaintiff's Rights Was Unremarkable*

This first consideration requires examination of the type and amount of force used. <u>See Deorle v. Rutherford</u>, 272 F.3d 1272, 1279 (9th Cir. 2001). Along with every arrest comes the right of the officer to use some degree of force to effect the arrest. <u>Graham</u>, 490 U.S. at 396. Police officers are not required to use the least intrusive degree possible – only such force which is reasonable viewed from the perspective of a reasonable officer on the scene. <u>Forrester v. San Diego</u>, 25 F.3d 804, 807-08 (9th Cir. 1994).

19

The police officers stopped Plaintiffs' vehicle, ordered them out of it at gunpoint, and handcuffed them.  Plaintiffs do not dispute that the police officers were permitted to stop the vehicle since it was reported as being involved in felony offenses.  Although humiliated and frightened, Plaintiffs have not alleged, or put forth any evidence, that they suffered any physical injuries (e.g., cuts, bruises) as a result of police conduct.[6]  Nor is there any evidence that the officers were yelling at Plaintiffs, threatening them, or otherwise engaging in abusive conduct.

Both police officers have averred that they kept their guns drawn only for a short period of time.  Officer Haglan re-holstered his gun as soon as he recognized Plaintiff Gaines.  Officer Pursley re-holstered his gun as soon as he had a hold of Plaintiff Adam's wrist and was able to handcuff her.  Although Plaintiff Adams avers that Officer Pursley held the gun less than one foot from her head, she does not dispute that this was only for a short period of time while the officer secured her wrists so that he could handcuff her.  There is no evidence that Officer Pursley did anything to make Plaintiff Adams believe that he was actually going to use the gun or otherwise cause her any physical

---

[6] In fact, when asked whether he "felt that the touching by handcuffing was offensive because the warrant had been recalled", Plaintiff Gaines responded "I was smiling all the way, okay." See Defendant's Reply at Exhibit L (Deposition of Michael Gaines at p. 71, lines 18-21).

20

harm.

The type and amount of force used was not excessively intrusive given the circumstances.

###   b.    The Government Interests at Stake Were Significant

Plaintiffs were driving a car reported as being involved in more than one felony.  "The government has an undeniable legitimate interest in apprehending criminal suspects." <u>Miller</u>, 340 F.3d at 964 (citing <u>United States v. Hensley</u>, 469 U.S. 221, 229 (1985) (referring to "the strong government interest in solving crimes and bringing offenders to justice")).  This interest is even stronger when, like here, the individuals are felony suspects.  <u>Id</u>.

The officers averred that they used the high risk felony traffic stop technique because they were concerned that the occupants of the vehicle could present a danger to themselves and to others.  (Haglan Aff. at ¶ 5; Pursley Aff. at ¶ 8.)  Every traffic stop bears a high risk for the police officers involved.  "[W]e have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile."  <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 110 (1977).  "[I]nvestigative detentions involving suspects in vehicles are especially fraught with danger to police officers.  A weapon can be concealed under the seat of a vehicle.  It is readily accessible to be used to harm any police officer who approaches

an automobile[.]" United States v. Salas, 879 F.2d 530, 535 (9th Cir. 1989)(internal citations and quotations omitted). See also Maryland v. Wilson, 519 U.S. 408, 413 (9th Cir. 1997); McNair v. Coffey, 279 F.3d 463, 464 (7th Cir. 2002)(noting that 94 officers were killed in traffic stops between 1990 and 1998).

The officers had information that the vehicle had been involved in a residential burglary. A residential burglary is considered a crime of violence. See United States v. M.C.E., 232 F.3d 1252, 1255-56 (9th Cir. 2000). See United States v. Jones, 759 F.2d 633, 640 n.10 (8th Cir. 1985)(noting that "[o]ver the ten-year period ending in 1983 sixty-five officers were feloniously killed while pursuing the perpetrators of burglaries"). Because the burglary occurred while the occupant was sleeping, it was unknown whether the suspects were armed.[7] Although there is no evidence that the Plaintiffs resisted the officers, the severity of the crime and the potential threat of the suspects to the safety of the officers or others weigh in favor of the County.

---

[7] Numerous courts, however, have noted the frequency with which burglars are armed with firearms. United States v. Walker, 924 F.2d 1, 4 (1st Cir. 1991)("burglars often carry weapons"); Gutierres v. State, 793 P.2d 1078, 1081 (Alaska App. 1990); State v. Carter, 707 P.2d 656, 660 (Utah 1985); People v. McGowan, 69 Ill.2d 73, 370 N.E.2d 73 (1977); People v. Castaneda, 42 Cal. Rptr. 2d 18, 22 (Cal. App. 4th Dist. 1995); State v. Stricklin, 955 P.2d 1, 3 (Ariz. App. Div. 2 1996).

### c.    The Amount of Force Used Was Objectively Reasonable

Whether the amount of force used is objectively reasonable is a case by case inquiry. The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." Robinson v. Solano County, 278 F.3d 1007, 1009 (9th Cir. 2002) (quoting Graham, 490 U.S. at 396-97).

Police officers may, in appropriate situations, point firearms at and handcuff suspects when stopping a vehicle. See United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982)(brief, but complete restriction of liberty, if not excessive under the circumstances, is permissible during Terry stop, and use of handcuffs is reasonable precautionary measure for officer safety); see also United States v. Greene, 783 F.2d 1364, 1367 (9th Cir. 1986); Jackson v. Sauls, 206 F.3d 1156, 1171-72 (11th Cir. 2000);  United States v. Garcia, 339 F.3d 116, 119 (2nd Cir. 2003); United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001); United States v. Askew, 403 F.3d 496, 507 (7th Cir. 2005).

Under the facts of this case, the officers' actions were objectively reasonable. Detective Simpson called the officers to

23

assist in the stop of a vehicle reported as having been involved
in felonies.  The officers did not use their guns for any longer
than necessary.  Weighing the gravity of the intrusion against
the Government interests, there is no evidence that the officers
used any more force than reasonably necessary to stop the vehicle
and detain the occupants while ensuring their safety and the
safety of others.  See Alexander, 64 F.3d at 1320 ("when an
officer reasonably believes force is necessary to protect his own
safety or the safety of the public, measures used to retrain
individuals, such as stopping them at gunpoint, and handcuffing
them, are reasonable"); see also Martin v. City of Oceanside, 205
F. Supp. 2d 1142 (S.D. Cal. 2002) (officer's warrantless entry
into residence with their guns drawn in response to domestic
violence call was not excessive force).

To support their argument, Plaintiffs rely heavily on
Robinson v. Solano County, 278 F.3d 1007 (9th Cir. 2002).  The
facts of that case, however, are distinguishable from this case.
In Robinson, the plaintiff shot two of his neighbor's dogs
because they were attacking his livestock and was then seen
walking down the street with his shotgun.  Id. at 1010.
Plaintiff's neighbor, the owner of the dogs, had a verbal
confrontation with Plaintiff and called the police.  Id.  When
the police arrived, the plaintiff came out of his house and began
walking toward the police.  Id.  Both officers unholstered their

24

guns and pointed them at plaintiff.  Id.  Plaintiff testified that one of the officers held his gun three or four feet from plaintiff's head.  Id.  Two other officers handcuffed plaintiff and placed him in the back of the patrol car.  Id.

In Robinson, the court held that the fact that the officers handcuffed the plaintiff and placed him in the squad car while they talked to other witnesses did not constitute excessive force.  Id. at 1013.  The court then addressed the issue of whether a drawn gun pointed at the suspect's head, at close range, constituted excessive force under the circumstances and found that it did.  Id.  The court observed that none of the factors justifying the use of force were present: the crime under investigation was a misdemeanor, the suspect was apparently unarmed and approaching the officers in a peaceful way, there were no exigent circumstances, and the officers outnumbered plaintiff.  Id. at 1014.

In contrast, the police here suspected Plaintiffs of having been involved in a violent felony and there were the same number of officers as suspects.  Also, unlike in Robinson where the police could clearly see that the suspect was no longer holding a shot gun, the police officers could not determine whether Plaintiffs were armed until they exited the car.  By using the high risk felony traffic stop technique the officers reasonably protected their safety as well as the safety of others.  In light

25

of these facts, this case involved more than an *ordinary*
investigatory stop during which drawing weapons and using
handcuffs is unreasonable.  <u>See</u>, <u>e.g.</u>, <u>Washington v. Lambert</u>, 98
F.3d 1181, 1187 (9th Cir. 1996).

Because the Plaintiffs in this case were not subject to
unconstitutionally excessive force, the County is not subject to
Section 1983 liability, even if the application of its high risk
traffic stop procedures may result in the use of excessive force
in other circumstances.  The Court, therefore, need not decide
whether a policy to use high risk traffic stop procedures in all
cases where the occupants of the vehicle are suspected of a
felony would be constitutional.  <u>See Heller</u>, 475 U.S. at 799;
<u>Jackson</u>, 268 F.3d at 653-654 (Neither a municipality nor a
supervisor, however, can be held liable under § 1983 where no
injury or constitutional violation has occurred);  <u>Grossman v.
City of Portland</u>, 33 F.3d 1200, 1203 (9th Cir. 1994) (same).[8]

### 2.    <u>False Arrest/Imprisonment</u>

Plaintiff Gaines contends that there is a material issue of
fact as to whether Officer Haglan falsely arrested and imprisoned

---

[8] Although a county may still be held liable under Section
1983 where the police officer is entitled to qualified immunity,
(<u>see</u> <u>Martin v. City of Oceanside</u>, 205 F. Supp. 2d 1142, 1148
(S.D. Cal. 2002)), the Court finds that the officers' use of
force was not objectively unreasonable under the Fourth Amendment
of the United States Constitution and does not base its finding
on qualified immunity grounds.

26

him as a result of Defendant's unconstitutional policy of tracking recalled warrants.

The Ninth Circuit Court of Appeals uses a four-part test in analyzing whether a local government may be liable for failing to act to preserve constitutional rights. The plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that the policy amounts to deliberate indifference; and (4) that the policy is the moving force behind the constitutional violation. See Oviatt v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing City of Canton v. Harris, 489 U.S. 378, 389-91 (1989)); see also Berry v. Baca, 379 F.3d 764, 767 (9th Cir. 2004) (applying four-part test in determining county's liability for "policy of inaction" regarding processing release of prisoners).

### a.  *No Constitutional Deprivation*

"In order to establish [Plaintiff Gaines'] right to proceed to trial on his municipal liability claim, the court must first determine that a constitutional violation has occurred." Erdman v. Cochise County, Arizona, 926 F.2d 877, 882 (9th Cir. 1991). The Fourteenth Amendment of the United States Constitution protects against deprivations of liberty without due process of law. See Fairley, 281 F.3d at 918. Plaintiff Gaines was not deprived of his liberty without due process.

It is undisputed that Officer Haglan arrested Plaintiffs

pursuant to a facially valid warrant which he believed was valid at the time of Plaintiff Gaines' arrest. (See Plaintiffs' Opposition at 20 ("Gaines has little doubt that the arresting police believed the warrant was valid."); Defendant's Concise Statement of Facts at Exhibit A (Bench Warrant for Michael A. Gaines); Haglan Aff. at ¶¶ 12-13.) Where, as here, there is a facially valid warrant and the arresting officer does not otherwise know that the warrant is invalid, the arrest is legally justified. See Baker v. McCollan, 443 U.S. 137, 145-46 (1979) (arrest and three-day detention pursuant to facially valid warrant was not unconstitutional; Constitution does not require "a sheriff executing an arrest warrant ... to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."); Erdman, 926 F.2d at 882 ("The second arrest alone was not a constitutional violation because it was pursuant to a facially valid bench warrant").

Officer Haglan arrested Plaintiff Gaines the evening of April 29, 2004 and the Sheriff released him the next morning. At the time Officer Haglan arrested Plaintiff, at approximately 5:00 p.m., the state court was already closed and the police could not have verified the warrant's validity.

On similar facts, the United States Supreme Court in Baker v. McCollan, 443 U.S. 137 (1979), held that the respondent who

28

was arrested under a valid warrant and detained in jail for three days despite his protests that the police had mistakenly identified him, was not deprived of liberty without due process of law and, therefore, had no constitutional claim. In <u>Baker</u>, the respondent sued the sheriff for wrongful detention in the county jail as a result of inadequate identification procedures. <u>Id</u>. at 141-142. After repeated complaints, the police finally checked the plaintiff's appearance against the file photograph and released him. <u>Id</u>. at 141, 144. The Court reasoned that "[r]espondent was indeed deprived of liberty for a period of days, but it was pursuant to a warrant conforming . . . to the requirements of the Fourth Amendment." <u>Id</u>. at 144. Although the Court recognized that detention pursuant to a valid warrant despite repeated protests of innocence will, after a certain amount of time, deprive the accused of liberty without due process of law, that was not the case in <u>Baker</u> and is, likewise, not the case here. <u>See id</u>. at 145 ("we are quite certain that a detention of three days over New Year's weekend does not and could not amount to such a deprivation").

Unlike the cases in which courts have found that a detention amounted to a constitutional deprivation, Plaintiff Gaines' detention was not unduly long. <u>See Fairley v. Luman</u>, 281 F.3d 913 (9th Cir. 2002) (plaintiff who continuously protested mistaken identity over course of twelve-day detention suffered

29

constitutional injury).

### b.    *Existence of a Policy or Custom*

Plaintiff Gaines must also demonstrate that the constitutional deprivation "resulted from an official policy or custom established by a municipal policymaker possessed with final authority to establish that policy." Erdman, 926 F.2d at 882.  The only evidence of Defendant's warrant tracking procedures is an affidavit from Alyssa Domion, the Warrants Clerk, and a letter from Ms. Domion to the Chief of Police of the Maui Police Department as part of the administrative inquiry regarding Plaintiff Gaines' arrest.  (See Defendant's Concise Statement of Facts at Affidavit of Alyssa Domion ("Dominon Aff."); Plaintiffs' Concise Statement of Facts at Exhibit 1.)

According to Ms. Domion, a clerk at the Wailuku District Court calls the Maui Police Department to inform it that a warrant has been recalled.  (See Domion Aff. at ¶ 5; Plaintiffs' Concise Statement of Facts at Exhibit 1.)  When the Maui Police Department receives a call from the Wailuku District Court, the original bench warrant is pulled from the receiving area and from dispatch.  (Id.)  The original warrant is returned to Wailuku District Court and a notation is made in the Maui Police Department's files that the warrant was recalled along with the date and name of the person who called.  (Domion Aff. at ¶ 6.) The recalled warrant is documented in the warrants log book and

on the computer.  (<u>Id</u>.)  In Plaintiff Gaines' case, the Wailuku
District Court did not provide notice that the warrant had been
recalled.  (Domion Aff. at ¶ 8; Plaintiffs' Concise Statement of
Facts at Exhibit 1.)

There is no evidence that the warrant tracking procedures
are an official or longstanding policy of the Maui Police
Department.  Ms. Domion is the Warrants Clerk, not the Chief of
Police.  <u>See</u> <u>Dixon v. County of Alameda</u>, 1997 WL 220311, at *5
(N.D. Cal. Apr. 18, 1997)(testimony by warrant division clerk as
to procedures used for recalled warrants did not show official
policy where there was no evidence that it was adopted or agreed
to by policymakers).[9]  The Court, however, need not decide
whether there is a genuine issue of fact as to whether the
warrant tracking procedure described by Ms. Domion is an official
policy or custom for which the County may be held liable, because
there is no evidence that the Defendant was deliberately
indifferent to the inadequacy or unconstitutionality of the
current policy.

### c. *No Deliberately Indifferent Official Policy or Custom*

"The existence of a policy, without more, is insufficient to
trigger local government liability under section 1983."  <u>Oviatt</u>,

---

[9] In <u>Fairley</u>, for instance, the Chief of Police testified as
to the policy at issue.  <u>See</u> <u>Fairley</u>, 281 F.3d at 918.

954 F.2d at 1477 (citing <u>City of Canton</u>, 489 U.S. at 388-89). Before the County may be held liable for failing to act to preserve a constitutional right, the plaintiff must demonstrate that the official policy evidences deliberate indifference to his constitutional rights.  <u>See</u> <u>City of Canton</u>, 489 U.S. at 389.  A policy evidences "deliberate indifference" "when the need for more or different action 'is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need.'" <u>Oviatt</u> 954 F.2d at 1477-78 (quoting <u>Canton</u>, 489 U.S. at 390).

Plaintiffs have not put forth any evidence to show that the need for more or different warrant tracking procedures was obvious or that the inadequacy of the tracking procedures was likely to result in a constitutional violation.  Plaintiffs, for instance, have not presented any instances of restrictions on an individual's liberty in violation of due process as a result of the County's warrant tracking procedures.  Nor have Plaintiffs presented any evidence of a systemic indifference to such detentions.[10]

---

[10] In contrast, the plaintiff in <u>Fairley</u> presented evidence that the detention of individuals on the wrong warrant was "not uncommon", yet the county chief of police had decided not to institute procedures to correct the problem.  <u>Fairley</u>, 281 F.3d at 918; <u>see</u> <u>Oviatt</u>, 954 F.2d at 1477-78 (jury reasonably found that county was indifferent where its policymaker, Sheriff Pearce, testified that he "knew of at least 19 incidents between

The facts here are similar to those in <u>Erdman v. Cochise</u> <u>County, Arizona</u>, 926 F.2d 877, in which the Ninth Circuit Court of Appeals affirmed the grant of summary judgment for defendant. In <u>Erdman</u>, Cochise County erroneously issued an arrest warrant for plaintiff on two felony charges after plaintiff had already settled the charges. <u>Id</u>. at 878. The police arrested plaintiff on another charge in another county, held him nine days pursuant to the erroneous warrant, then transferred him to Cochise County and held him three more days before the error was discovered. <u>Id</u>. In granting summary judgment for the county, the court noted that "[n]o evidence was presented to indicate that the County habitually misfiles paperwork so as to result in dual arrests for the same crime, or that the unfortunate combination of errors . . . was intentional." <u>Id</u>. at 882.

Finally, Plaintiff Gaines cannot satisfy the fourth factor, *i.e.*, that the defendant's policy was closely related to the ultimate injury, because, as stated above, Plaintiff Gaines did not suffer a constitutional injury.

**B.    <u>State Law Tort Claims (Counts II - IX)</u>**

The parties to the present case are not diverse. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

---

1981 and 1989 in which individuals sat in jail for periods of undetermined length after they missed arraignment").

33

Defendant is entitled to summary judgment on all of Plaintiffs' federal question claims.  Eight state law tort claims remain (Counts II - IX).

When federal claims are dismissed before trial, and the only remaining claims are state claims over which a court has supplemental jurisdiction, a court must undertake a balancing test.  The court must consider judicial economy, convenience, fairness to the parties, and comity.  The balance of factors typically points towards remanding or dismissing the state claims without prejudice.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); Gini v. Las Vegas Metro. Police Dept., 40 F.3d 1041, 1046 (9th Cir. 1994); Albingia Versicherungs A.G. v. Schenker Int'l. Inc., 344 F.3d 931, 938 (9th Cir.) amended by 350 F.3d 916 (2003).

In weighing these factors, the Court declines to exercise supplemental jurisdiction over the state law claims.  28 U.S.C. § 1367(c)(3).  The remaining state law claims involve issues of Hawaii law and are best resolved by a Hawaii state court.  The state law claims are REMANDED to the state court.

## CONCLUSION

In accordance with the foregoing, it is **HEREBY ORDERED THAT:**

1.    The Defendant's motion to strike is **GRANTED** with respect to Exhibits 3, 4 and 5 to Plaintiffs' Concise Statement of Facts and with respect to the subsequent remedial measures

34

recommended in Exhibit 1 to Plaintiffs' Concise Statement of Facts on the pages bates stamped numbered 0000051 and 0000068.

2.    The motion to strike evidence is **DENIED** with respect to the Declaration of Dana Adams and Exhibit 1 to Plaintiffs' Concise Statement of Facts, except for the subsequent remedial measures on the pages bates stamped numbered 0000051 and 0000068.

3.    With regard to Plaintiffs' claims of unconstitutional excessive force and false arrest/imprisonment brought pursuant to 42 U.S.C. § 1983 (Count I of the Complaint) Defendant's Motion for Summary Judgment is **GRANTED**.

4.    Plaintiffs' state law claims, Counts Two through Nine, are **REMANDED** to the Circuit Court for the Second Circuit, State of Hawaii.

5.    There being no claims remaining for trial, the case is **DISMISSED**.

IT IS SO ORDERED.

The Clerk of the Court shall mail the entire record and a certified copy of this Order to the Clerk of the Circuit Court for the Second Circuit, State of Hawaii.

35

DATED: Honolulu, Hawaii, _____December 22_____, 200<u>5</u>.


HELEN GILLMOR
Chief United States District Judge


Michael Gaines, et al. v. County of Maui et al., Civil No. 04-00518
HG-LEK; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS
TO PLAINTIFFS' FEDERAL LAW CLAIM AND REMANDING STATE LAW CLAIMS