**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VALERIE GREGORY, individually as
a Special Administrator of the
Estate of Richard J. Gregory,
deceased, and as next friend of
Isreal Gregory, a minor; Keanu
Gregory, a minor; Kalani Gregory,
a minor; and Shayisse Gregory, a
minor,

        *Plaintiffs-Appellants,*

        v.

COUNTY OF MAUI; MAUI POLICE
DEPARTMENT; GARRET TIHADA;
EDWIN K. AMONG; NICHOLAS E.
ANGELL,

        *Defendants-Appellees.*

No. 06-15374

D.C. No.
CV-04-00516-SPK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Samuel P. King, Senior District Judge, Presiding

Argued and Submitted
November 6, 2007—Honolulu, Hawaii

Filed April 29, 2008

Before: Diarmuid F. O'Scannlain, A. Wallace Tashima, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge O'Scannlain

GREGORY v. COUNTY OF MAUI

## COUNSEL

David J. Gierlach, Honolulu, Hawaii, argued the cause for the plaintiffs-appellants; Brian A. Duus, Honolulu, Hawaii, was on the brief.

Kenneth Robbins, Robbins & Associates, Honolulu, Hawaii, argued the cause for the defendants-appellees; Brian T. Moto, Corporation Counsel, and Laureen L. Martin, Moana M. Lutey, Richard B. Rost, Deputy Corporation Counsel, County of Maui, Wailuku, Hawaii, were on the brief.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether police officers used excessive force in violation of the Fourth Amendment in attempting to restrain an individual.

I

A

On December 2, 2002, Richard Gregory and a friend were guests in a music studio operated by Vincent Finazzo and Jason Fuqua in Lahaina, Maui, Hawaii. Finazzo and Fuqua were playing music and working on new songs, and they eventually decided to leave the studio and asked Gregory to do the same. Gregory, however, had taken interest in a guitar he found and insisted on staying. An exchange soon became heated, as Gregory took on an increasingly pugnacious tone and posture, telling Finazzo, "Don't make me hit you." When Finazzo tried to call a friend of Gregory's to calm him down, Gregory threw Finazzo's cell phone to the ground. Gregory began to pace around the room, stating that "we're all going

to hell" and that the devil was in the room. When Finazzo made a final effort to coax Gregory to leave, Gregory shoved him into a door.

At that point, Fuqua called the police. Approximately five minutes later Maui County Police Officers Garret Tihada, Nick Angell and Ed Among arrived at the scene. A police dispatch agent informed the officers that a white male possibly high on drugs had trespassed on the property and refused to leave; upon arriving, the officers were informed that Gregory had hit Finazzo. While Finazzo and Fuqua stood outside the studio, the officers went inside, where they saw Gregory holding a pen with its tip pointed at them. The officers later noted that Gregory appeared to be "high strung, excitable and jumpy," speaking loudly and rapidly and informing the officers that he was a Christian and that God was with him.

The officers repeatedly asked Gregory to put down the pen, but Gregory refused each request. After Gregory refused a third time, Officer Angell grabbed Gregory's right arm and attempted to swing Gregory's body around into a position where the pen would face away from the officers. When Gregory resisted, Officers Angell and Among pinned Gregory to the ground and attempted to hold his arms, as Officer Tihada tried to hold down Gregory's back and neck, all the while telling him to relax and not to resist. Officer Tihada was able to grab the pen and throw it away from Gregory's reach, but Gregory still struggled. As the officers continued their attempt to subdue Gregory, he repeatedly shouted that he could not breathe, which Officer Tihada told him was impossible because he could talk. While helping to control Gregory, Officer Tihada used a hold around Gregory's head and neck to restrain him, which the officers later insisted was not a choke hold. The officers did not strike Gregory, nor did they draw their firearms.

The officers were finally able to handcuff Gregory, but when they sat him up, they discovered that he was not breath-

ing. Their efforts to resuscitate him failed, and Gregory was later pronounced dead from a heart attack. An autopsy conducted by Dr. Anthony Manoukian revealed that Gregory suffered from severe heart disease,[1] and that Gregory was under the influence of marijuana at the time of the confrontation. Dr. Manoukian concluded that the marijuana use likely contributed to the heart attack. Regarding Gregory's statements that he could not breathe, Dr. Manoukian noted that a sensation of shortness of breath is a common symptom of a heart attack. He confirmed that Gregory was breathing during the struggle since he was able to talk, and noted that there was no sign that Gregory was choked or that choking contributed to his death.

B

Gregory's estate sued the officers and the County of Maui (collectively, "the officers") under 42 U.S.C. § 1983, alleging that the officers used excessive force in violation of the Fourth Amendment, that the county ratified the officers' use of such force, and that the county failed properly to train them. The estate also brought several state-law claims. The officers moved for summary judgment on all claims, arguing that the use of force was reasonable, and that in any event such force was not the proximate cause of Gregory's death.

In opposition to the motion, the estate provided the deposition of Dr. Vincent Di Maio, M.D., who stated that Gregory's heart attack likely was triggered by Excited Delirium Syndrome ("EDS"). According to Dr. Di Maio, EDS involves the sudden death of an individual in connection with an episode of excited delirium,[2] which in some occasions can be trig-

---

[1]The autopsy report revealed that Gregory's luminal artery showed 90% narrowing. Other undisputed medical evidence indicated that narrowing greater than 70-75% is considered severe.

[2]Dr. Di Maio explained that excited delirium involves disorientation, hallucinations, disturbances in speech and "combative and/or violent behavior."

gered by mental disease or the "heavy use" of marijuana. Dr. Di Maio stated that in virtually all cases of EDS, the episode of excited delirium is terminated by a violent struggle with police or medical personnel and the use of physical restraint, after which the individual often suffers a heart attack. The estate argued that the officers should have recognized that Gregory was in a state of excited delirium, and accordingly that they used excessive force in physically restraining him.

The district court granted summary judgment to the officers on all federal claims. Relying on the undisputed facts "that Gregory was trespassing and acting aggressively," that Gregory refused to drop the pen in his hand, and that the officers never drew their weapons or used pepper spray on Gregory, the district court concluded that "[t]he use of force in response to it was proportionate and reasonable."

## II

### A

[1] To determine whether the force used by the officers was excessive under the Fourth Amendment, we must assess whether it was objectively reasonable "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). In this analysis, we must consider the following factors: (1) the severity of the crime at issue; (2) whether Gregory posed an immediate threat to the safety of the officers or others; and (3) whether Gregory actively resisted arrest. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001). "Because such balancing nearly always

4618          GREGORY v. COUNTY OF MAUI

requires a jury to sift through disputed factual contentions, and to draw inferences therefrom . . . summary judgment or judgment as a matter of law . . . should be granted sparingly" in cases involving claims of excessive force. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).

[2] Here, the officers had substantial grounds for believing that some degree of force was necessary in confronting Gregory. Upon arriving at the scene, the officers were informed that Gregory had assaulted Finazzo and that he possibly was under the influence of drugs; it is undisputed that Gregory acted in a bizarre manner throughout the confrontation. When the officers entered the studio, they saw Gregory holding a pen with its point facing toward them.[3] While the pen is not always mightier than the sword, a properly wielded writing instrument may inflict lethal force. *See United States v. Bankston*, 121 F.3d 1411, 1412 n.1 (11th Cir. 1997) (noting that a pen held by a bank robber was a "dangerous weapon" where the robber threatened to use it to kill a teller).

[3] The officers did not immediately engage in a physical confrontation with Gregory. Rather, they first asked him to drop the pen.  Only after Gregory repeatedly and expressly

---

[3]The estate argues that a triable issue exists as to whether Gregory held a pen, relying on a single statement by Fuqua in a deposition that he did not overhear the officers say that Gregory had anything in his hands. However, Fuqua stood outside the studio and did not witness the confrontation. It is undisputed that the studio floors, walls and windows were covered with four to five layers of carpeting to "keep[ ] most of the sound from escaping." Absent from the record are foundational or follow-up questions concerning how much of the conversation Fuqua was able to hear and how well he was able to hear it. Under these circumstances, we cannot conclude that this isolated statement is sufficient to create a triable issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (holding that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to create a triable issue of material fact).

While the estate also makes much of Finazzo's deposition testimony that he did not see Gregory holding a pen, it is undisputed that Finazzo was not in the studio throughout the officers' confrontation with Gregory.

refused to comply did they attempt to disarm him, and they only sought to restrain Gregory once he resisted. There is no showing that the officers ever struck Gregory, or that they drew or used a weapon. *See Arpin*, 261 F.3d at 922 (holding that officers did not use excessive force in "using physical force to handcuff" an unarmed suspect who resisted by stiffening her arm).

**[4]** Accordingly, although the confrontation came to a tragic end, we must conclude that the officers did not use excessive force. The severity of Gregory's trespass and of the threat he posed were not overwhelming, but we are satisfied that the force used by the officers was proportionate to both. The Fourth Amendment does not require more. *See Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994) ("Police officers . . . are not required to use the least intrusive degree of force possible . . . [T]he inquiry is whether the force that was used to effect a particular seizure was reasonable.").

B

We are mindful that cases in which the victim of alleged excessive force has died "pose a particularly difficult problem" in assessing whether the police acted reasonably, because "the witness most likely to contradict [the officers'] story . . . is unable to testify." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). Accordingly, we must "carefully examine all the evidence in the record" to determine if the officers' account of the events is credible. *Id*. Following such reasoning, we have denied summary judgment to defendant police officers in cases where "a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force." *Santos v. Gates*, 287 F.3d 846, 852 (9th Cir. 2002).

**[5]** Here, the evidence does not undermine the officers' account of their encounter with Gregory. To the contrary, the undisputed evidence supports the officers' contention that Gregory acted in an aggressive manner, and that he stubbornly refused to comply with the requests of the officers, Finazzo and Fuqua. Medical evidence shows that Gregory died of a heart attack caused at least in part by severely narrowed arteries and marijuana use, rather than from choking or a direct result of force.[4] Moreover, even were the officers' accounts of the confrontation incredible, there is no medical or circumstantial evidence that could support the conclusion that the use of force by the officers was excessive. *Compare id*. at 853 (holding that circumstantial evidence created a jury question as to excessive force where, immediately after a confrontation with police, Santos's spine was discovered to have been broken).

C

The estate argues that, because the officers knew that Gregory was "possibly high on drugs," and that he was "talking loudly about God" when they arrived, the officers were objectively unreasonable in failing to recognize that Gregory was in a state of excited delirium. However, even accepting that Gregory was in such a state and that the officers should have recognized it, the officers' response to the threat Gregory posed—first confronting him verbally, and only then attempting to disarm and to restrain him—still was objectively reasonable. Moreover, the deposition testimony and declarations

---

[4]Because there is no evidence that Gregory was choked, there is no triable issue of fact as to whether the officers used a choke hold on Gregory. It is undisputed that Officer Tihada used a hold around Gregory's head and neck, but the undisputed medical evidence shows that there were no signs of choking or the use of a choke hold on Gregory. Likewise, it is undisputed that Gregory was able to talk throughout the confrontation, and the estate presented no evidence rebutting the autopsy's conclusion that Gregory must have been able to breathe if he could talk.

of the officers all confirm that they used a calm tone with
Gregory throughout the confrontation.

[6] The estate apparently does not dispute that such conduct
would pass muster under the Fourth Amendment. Instead, it
argues that there is a triable issue as to whether the officers
"went into the studio and immediately, without warning, initi-
ated the struggle with Gregory." Yet the undisputed evidence
belies such a claim, as the testimony and declarations in the
record all confirm that the officers spoke to Gregory before
the physical confrontation began. *See Scott v. Harris*, 127
S. Ct. 1769, 1776 (2007) ("When opposing parties tell two
different stories, one of which is blatantly contradicted by the
record, so that no reasonable jury could believe it, a court
should not adopt that version of the facts for purposes of rul-
ing on a motion for summary judgment.").

Our holding in *Drummond* does not suggest that the offi-
cers in this case acted unreasonably. In *Drummond*, we
reversed a grant of summary judgment to defendant police
officers in an excessive force case. 343 F.3d at 1063. Drum-
mond, a schizophrenic, was "hallucinating and in an agitated
state" in a convenience store parking lot; the officers were
called to take Drummond into custody to "help protect" him.
*Id*. at 1054. Even though Drummond had not committed a
crime, was not a danger to himself or others, and did not offer
resistance, the officers knocked him to the ground and placed
a knee to the back of his neck as they placed him into protec-
tive custody. *Id*. The officers continued to restrain Drummond
even after handcuffing him, despite his repeated complaints
that he could not breathe. *Id*. at 1054-55. Drummond suffered
a heart attack soon thereafter and fell into a permanent coma.
*Id*. at 1055.

Noting that the situation faced by the officers was "differ-
ent from those involved in law enforcement efforts to subdue
an armed and dangerous criminal who has recently committed
a serious offense," *id*. at 1058 (quoting *Deorle v. Rutherford*,

4622          GREGORY V. COUNTY OF MAUI

272 F.3d 1272, 1282-83 (9th Cir. 2001)), we held that Drummond's "mental illness must be reflected in any assessment of the government's interest in the use of force," particularly because Drummond was unarmed and "emotionally distraught." *Id.*

[7] *Drummond* is distinguishable from this case, even accepting that the officers here should have recognized that Gregory was "emotionally distraught." Unlike the police in *Drummond*, the officers here did not immediately use force upon encountering Gregory, but rather first attempted verbally to coax him into dropping the pen. Moreover, the officers had reason to believe that Gregory posed a threat to them, because he refused their requests, acted in an aggressive manner, and had already assaulted Finazzo. Further, Gregory had committed an underlying offense, a trespass. *See id.* at 1057 (noting that "*no* underlying crime was 'at issue' ") (emphasis in original). Finally, unlike *Drummond*, Gregory resisted the officers throughout the encounter, and the officers in this case ceased using force once Gregory was handcuffed. *See id.* at 1057-58 ("After he was knock[ed] . . . to the ground where the officers cuffed his arms behind his back as [he] lay on his stomach, a jury could reasonably find that he posed only a minimal threat to anyone's safety.") (internal quotation marks omitted). Thus, even though "the governmental interest in using such force is diminished by the fact that the officers [were] confronted . . . with a mentally ill individual," the undisputed facts show that the officers in this case reasonably used the minimal force necessary to disarm and to restrain Gregory, and that they ceased such force once the threat was neutralized. *Id.* at 1058 (quoting *Deorle*, 272 F.2d at 1282-83).[5]

_____

[5]The estate also cites *Alexander v. County of Los Angeles*, 64 F.3d 1315 (9th Cir. 1995), to urge that the officers in this case used excessive force in "initiat[ing] the struggle with Gregory despite clear symptoms he was mentally disturbed." However, *Alexander* involved officers' refusal to loosen handcuffs on a suspect even though he repeatedly informed officers that he was a dialysis patient, and where the officers had agreed to loosen another suspect's handcuffs. *Id.* at 1322-23. The excessive force in that case occurred *after* Alexander had been handcuffed, whereas in this case there is no showing that any force was applied once Gregory was handcuffed.

III

**[8]** Because we conclude that the officers did not use excessive force in violation of the Fourth Amendment, the estate's § 1983 claims against the county also fail. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.") (emphasis omitted); *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (noting that a failure to train claim requires a showing that the victim suffered an actual deprivation of a constitutional right).

IV

The district court disposed of all the estate's federal claims on summary judgment, but did not expressly address the estates' state law claims. Accordingly, we infer that the district court declined to retain supplemental jurisdiction over the remaining state law claims under 28 U.S.C. § 1367(c). *See Summum v. Duchesne*, 482 F.3d 1263, 1275-76 (10th Cir. 2007).

V

For the foregoing reasons, we are persuaded that the officers' use of force was reasonable. The decision of the district court is therefore **AFFIRMED.**